[No. B151761. Second Dist., Div. Three. Aug. 29, 2002.]

SANTA MONICA CHAMBER OF COMMERCE et al., Plaintiffs and Appellants, v.
CITY OF SANTA MONICA, Defendant and Respondent.

## COUNSEL

Harding, Larmore, Kutcher & Kozal, Christopher M. Harding and Kenneth L. Kutcher for Plaintiffs and Appellants.

Marsha Jones Moutrie, City Attorney, Barry A. Rosenbaum, Senior Land Use Attorney, and Cara E. Silver, Deputy City Attorney, for Defendant and Respondent.

## OPINION

**CROSKEY, J.—** ■■■ The Santa Monica Chamber of Commerce and Daniel L. Ehrler (collectively Chamber of Commerce) sued the City of Santa Monica (City) under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.)[1] (CEQA), after City failed to prepare an environmental impact report (EIR) before adopting legislation that created a large, residents-only, permit-required parking district (PPZ, for preferential parking zone).[2]

The trial court denied Chamber of Commerce's petition for a writ of mandamus directing City to prepare the EIR before adopting the legislation,

---

[1] All further statutory references are to the Public Resources Code, except as otherwise noted.

[2] Under CEQA, a "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public

and Chamber of Commerce appeals. We conclude that the legislation is exempt from the requirements of CEQA, no exceptions to the exemption apply, and thus, the trial court did not err by denying Chamber of Commerce's petition for a writ of mandate. Accordingly, we affirm.

## Factual and Procedural Background[3]

On November 14, 2000, City adopted Resolution No. 9596 (the legislation). This resolution established "Preferential Parking Zone XX" (PPZ XX), an approximately 26-acre, permitted-parking zone. It provided that for 19 hours a day, seven days a week, from 7:00 a.m. to 2:00 a.m., only vehicles displaying a residential parking permit will be allowed to park along the unmetered curbs on residential streets. The legislation also provided that businesses may be able to obtain commercial parking permits to park along unmetered curbs on residential streets in PPZ XX if it is determined, after the legislation is implemented, that over 50 percent of the parking on a given street is unoccupied.

On November 20, 2000, City filed a CEQA Notice of Exemption stating that the legislation was exempt from CEQA review under a categorical exemption contained in California Code of Regulations, title 14, section 15301, subdivision (c).[4] This section provides a "Class 1" exemption for, among other things, the operation or permitting, or minor alteration, of

agency. . . ." (§ 21065; *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1169 [109 Cal.Rptr.2d 504] (*Apartment Assn.*).)

Ordinances passed by cities are clearly activities undertaken by a public agency and thus potential "projects" under CEQA. (*Apartment Assn., supra,* 90 Cal.App.4th at p. 1169; 60 Ops.Cal.Atty.Gen. 335, 338 (1977).) Therefore, the adoption of legislation creating the restricted parking zone is a "project" within the meaning of CEQA, *if* such legislation *may* cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.

According to Chamber of Commerce, the evidence demonstrates that the legislation in question *may* create such a change; therefore City should have submitted it to CEQA review before adopting it, and therefore it is a project. City's position is that the activity is exempt from CEQA and no exception applies, because there is no evidence that it *might* cause any significant environmental impact. In other words, the legislation would not constitute a "project" as defined by CEQA.

[3]These facts are taken from the administrative record, and include facts as to which there is some dispute, because, for purposes of this appeal, we are applying the least-deferential-to-the-agency's-decision standard of review, and are considering whether there is any substantial evidence to support a fair argument that the project will have a substantial effect on the environment. (See Discussion, pt. 3.a., *post.*)

[4]Title 14, section 15000 et seq. contains the regulations that are known as the CEQA Guidelines, which we will hereafter refer to simply as Guidelines. Guideline section 15301, which is found in title 14, article 19, "Categorical Exemptions," provides, in relevant part: "Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or

existing public structures or facilities, that involves negligible or no expansion of use beyond that existing at the time of the lead agency's determination. According to this section, "existing facilities" may include "[e]xisting highways and streets, sidewalks, gutters, bicycle and pedestrian trails, and similar facilities." The section also emphasizes that "[t]*he key consideration is whether the project involves negligible or no expansion of an existing use.*"

In its Notice of Exemption, City, which had performed a survey of parking needs and uses in the area (see fns. 5 and 6, *post*, for the results of that survey), described the reasons the legislation was exempt. That description, included, in relevant part, that:

(1) "The project [i.e., the legislation] consists of the operation of and permitting of existing streets."

(2) "It will not expand the use of the streets."

(3) "It will not increase the occupancy of parking spaces in the area."[5]

(4) "Not all the parking spaces in the area will be regulated by the restrictions, thereby minimizing displacement of vehicles."[6]

---

minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1. The key consideration is whether the project involves negligible or no expansion of an existing use.

"Examples include but are not limited to: [¶] . . . [¶]

"(c) Existing highways and streets, sidewalks, gutters, bicycle and pedestrian trails, and similar facilities (this includes road grading for the purpose of public safety). [¶] . . . [¶]

"(g) New copy on existing on and off-premise signs; . . ."

[5]According to City's Notice of Exemption, "The one block that currently had parking restrictions experienced occupancies of between 60 and 76 % during weekdays from 7:00 a.m. to 9:00 p.m. Midday Saturday occupancies were measured at 81 percent. Given the average occupancy on the block that currently had preferential parking (67 %), compared to the average occupancy of blocks that would be eligible for preferential parking (84 %), the occupancy was expected to decrease by 17 %. Because each block has an average of 36 parking spaces, 6 cars currently parking on each of the 25 blocks would be affected for a total of approximately 150 vehicles. Customer vehicles will likely shift from currently free street parking to nearby and available metered parking spaces. An average of 70 metered spaces are available in the area during weekdays. Other vehicles will park in spaces adjacent to non-residential buildings that will remain unregulated. The City of Santa Monica expects the majority of parking spaces in the area will continue to be well utilized."

[6]According to City's Notice of Exemption, "There are approximately 1,202 parking spaces within the district boundaries including the adjacent commercial streets of Santa Monica Boulevard, Broadway and Colorado Avenue between Lincoln Boulevard and 14th Street. When the zone is fully implemented, approximately 53 % or 637 spaces will be subject to the

(5) "The permitting of the streets in the district will have minimal impact in that it will not result in an increase in the number of cars parked on the designated streets but instead will simply redistribute vehicles and gives [*sic*] preference to residents."

After City adopted the legislation, Chamber of Commerce sued City under CEQA, contending that the legislation could not properly be exempted under the Class 1 category, and that City was required to prepare an EIR before it could decide whether or not to adopt the legislation establishing PPZ XX. After reviewing the parties' arguments, the trial court held that Chamber of Commerce failed to produce any evidence of significant environmental effects, and had failed to meet its burden of producing substantial evidence to defeat City's use of the Class 1 categorical exemption. Accordingly, it denied Chamber of Commerce's petition for a writ. Chamber of Commerce filed timely notice of appeal.

### CONTENTIONS ON APPEAL

Chamber of Commerce contends that (1) the trial court erred by concluding that the legislation was exempt from CEQA; (2) the trial court's determination is, as a matter of law, subject to de novo review on appeal rather than being reviewed using a substantial evidence standard; (3) the Class 1 categorical exemption does not apply because (a) City had not recognized it as applicable with respect to prior PPZ projects, and (b) the exemption only applies to individual permits, not to the adoption of a legislative permitting scheme; (4) even if the legislation involved an exempt activity, Chamber of Commerce presented a fair argument that the legislation might possibly have a significant impact on the environment under the "cumulative impacts" and/or "unusual circumstances" exceptions to such exemption, and therefore the trial court erred by denying the petition for a writ of mandate.

City disputes these contentions, and urges that (1) the Class 1 categorical exemption from CEQA applies to the legislation, and (2) there is no substantial evidence that the categorical exemption is negated by any exception,

---

preferential parking regulation leaving 47 % or 565 spaces available to non-residents. Of the 565 spaces, 300 spaces consists [*sic*] of metered parking and 265 spaces are unregulated. Based on a survey of the 265 unregulated spaces between 7:00 a.m. and 9:00 p.m. on a weekday, approximately 44 % or 116 of the vehicles were parked for no longer than two hours. . . . This information supports the conclusion that while individuals presently park on residential streets where parking is free instead of parking at the street meters, metered parking provides a viable option. The regulations will result in a redistribution of parking in the area so that commercial parkers park in the 565 spaces available to non residents and the residents have access to the remaining 637 spaces. In addition, should the average parking occupancy of the regulated spaces on a street fall below 50 %, commercial businesses will be permitted to obtain permits to park in the residential area."

in other words, the "cumulative impact" or "unusual circumstances" exceptions to the categorical exemption do not apply.[7]

DISCUSSION

1. *CEQA's Three-tiered System for Environmental Review*

CEQA consists of a three-tiered structure of environmental review. (*Apartment Assn., supra,* 90 Cal.App.4th at p. 1167.) If a project falls within a category exempted from environmental review by statute or administrative regulation, no further agency evaluation is required. (§§ 21080, subd. (d), 21084, subd. (a); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66]; *Apartment Assn., supra,* 90 Cal.App.4th at p. 1167.) If the project is not categorically exempt (or if, although it is exempt, some exception applies to take such particular project out of the otherwise applicable exempt category), the agency undertakes an "Initial Study" of the project. (Guidelines, § 15063; *Apartment Assn., supra,* 90 Cal.App.4th at 1167.)

If such study demonstrates that the project will not have a significant effect on the environment, the agency makes a "negative declaration" to that effect. (§ 21080, subd. (c); *Apartment Assn., supra,* 90 Cal.App.4th at 1167.) On the other hand, if the "Initial Study" determines that the project *may* have a significant effect on the environment, an EIR is required. (§ 21151; *Apartment Assn., supra,* 90 Cal.App.4th at 1167.)

■ Here, therefore, the first question is whether or not the legislation is properly exempted from environmental review under CEQA, specifically, under the Class 1 exemption for existing facilities. ■ In reviewing City's determination that the legislation fell within a categorical exemption to CEQA review, the task of the trial court was, and ours is, to determine whether, *as a matter of law,* the legislation met the definition of a categorically exempt project. (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251 [89 Cal.Rptr.2d 233] (*Fairbank*).) In other words, we apply a de novo standard of review, not a substantial evidence standard.

2. *As a Matter of Law, the Legislation Meets the Class 1 Exemption Definition*

■ Certain projects are exempted from CEQA review, provided such categorical exemptions are not used for projects where it can be readily

---

[7]City also contends that Chamber of Commerce's lawsuit is a "classic misuse" of CEQA, by persons attempting to maintain a monopoly on street parking in residential neighborhoods, although it does not go so far as to urge that the appeal should be dismissed or otherwise determined on such basis.

perceived that such projects may have a significant effect on the environment. (§ 21084, subd. (a); *Apartment Assn., supra,* 90 Cal.App.4th at p. 1173; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 966 [91 Cal.Rptr.2d 66]; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1192 [61 Cal.Rptr.2d 447].) When an otherwise exempt project actually will have a significant impact on the environment for some reason, then that reason becomes an exception to any categorical exemption.

A Class 1 exemption applies to activities involving "the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of *existing* public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination." (Guidelines, § 15301, italics added.) It is this Class 1 exemption that City applied to exempt the legislation from CEQA review (and as to which exemption Chamber of Commerce argues that, even if such exemption does apply, the "cumulative impacts" and "unusual circumstances" exceptions to the exemption apply).

Even when we construe such categorical exemption narrowly (see, e.g., *County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at p. 966 [91 Cal.Rptr.2d 66]; *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 171 [258 Cal.Rptr. 147]; cf. *Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, 842 [171 Cal.Rptr. 753] [exemption categories are not to be expanded or broadened beyond the reasonable scope of their statutory language; such a construction allows the court to afford the fullest possible protection to the environment within the reasonable scope of the statutory language]), it is clear that the Class 1 exemption applies to the legislation/project here. The legislation involves adjusting the particular group of persons permitted to use "existing facilities," in other words, the existing, unmetered, curbside parking on residential streets. The legislation involves the "operation" of such existing facilities (in the sense that curbside parking is "operated" by using parking permits, enforcement personnel and ticketing as a form of enforcing the legislatively prescribed use), the "minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features" (i.e., the signage needed to identify particular curbside spots as permitted parking or not), and "negligible or no expansion of use beyond that previously existing," because no additional parking spaces or structures are being added to the parking stock in the relevant area.

Chamber of Commerce raises two arguments against the applicability of the Class 1 exemption to this legislation. First, it stresses that City has

treated its prior PPZ projects as though they were not exempt from CEQA review, and did not attempt to apply the Class 1 categorical exemption to such other PPZ legislation to avoid CEQA review before adopting such legislation. And, although City staff took the position that a recent amendment to the CEQA Guidelines had led them to treat this PPZ differently, Chamber of Commerce points to legislative commentary indicating that such amendments were merely reflective of existing law, and did not work any substantive changes.

The fact that City previously interpreted CEQA's categorical exemptions as inapplicable to PPZ's is irrelevant to our analysis. We are not interpreting a *contract* between City and Chamber of Commerce, a situation in which evidence of the parties' own interpretation of their agreement may be relevant. Judicial interpretation of the Public Resources Code and the Guidelines is a matter of state law, and obviously not subject to being influenced by how one particular city, and one particular group of municipal staff members, may have interpreted these laws.[8]

The second argument made by Chamber of Commerce is that the Class 1 categorical exemption was not intended to apply to the adoption of a legislative permitting *scheme,* but rather was only intended to apply to the issuance of permits for individual facilities. It urges that the Class 1 categorical exemption "is intended for small matters such as a minor street repair or the issuance of individual permits or licenses that clearly have no adverse environmental consequences," citing *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster, supra,* 52 Cal.App.4th 1165, 1201-1202 (*Azusa*), and *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307 [31 Cal.Rptr.2d 914].

The cases cited by Chamber of Commerce do not specifically or even impliedly hold that the Class 1 exemption was not intended to apply to such legislative action, or that it was intended to apply only to individual permits. In contrast, the Class 1 exemption itself specifically states that it is applicable to activities involving the operation of existing public facilities—and that is exactly what the legislation here involves.

---

[8]Furthermore, without the complete record on every single past PPZ treated by City as though it *should* be subject to CEQA review, it is mere speculation that all, or any, of such past PPZ projects, were, in fact, *not* subject to CEQA review. In other words, it may be that, because of facts specific to such projects, some exception to the categorical exemption did apply to some or all of them. Or, it may simply be that City failed to consider using, or decided not to use, the categorical exemption as to such projects. Chamber of Commerce has no authority that such past decisions as to past projects legally compels City to follow a similar course as to all future PPZ legislation.

Accordingly, we conclude, as a matter of law, that the legislation here is one to which the Class 1 exemption normally applies, and that it is exempt from CEQA review, *unless some exception applies.*

### 3. *There Is No Substantial Evidence of Any Exception to the Exemption*

Chamber of Commerce urges that, even if the legislation comes within the Class 1 categorical exemption, it demonstrated below that an exception to the exemption applies so as to require CEQA review of the legislation. It contends that it presented evidence of two exceptions showing that the legislation may have a significant effect on the environment: (1) the *"cumulative impact"* exception (citing Guidelines, § 15300.2, subd. (b)), and (2) the *"unusual circumstances"* exception (citing Guidelines, § 15300.2, subd. (c); *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 206 [132 Cal.Rptr. 377, 553 P.2d 537]; *Azusa, supra,* 52 Cal.App.4th at pp. 1201-1202; and *Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644 [11 Cal.Rptr.2d 850], disapproved on another ground in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570 and fn. 2 [38 Cal.Rptr.2d 139, 888 P.2d 1268]).

Before we consider whether Chamber of Commerce established any exception to the Class 1 categorical exemption, we first consider the applicable standard of review.

### a. *The Applicable Standard of Review on the Issue of Exceptions to Categorical Exemptions*

The Guidelines provide that categorical exemptions may not be used where there is a reasonable possibility that the activity will have a significant effect on the environment (1) when "the cumulative impact of successive projects of the same type in the same place, over time is significant" (Guidelines, § 15300.2, subd. (b)), or (2) due to "unusual circumstances." (Guidelines, § 15300.2, subd. (c).) A significant effect is a "substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068.) This means that an activity has a significant effect if, among other things, it "has the potential to degrade the quality of the environment." (Pub. Resources Code, § 21083; *Azusa, supra,* 52 Cal.App.4th at pp. 1197-1198.)

Chamber of Commerce, not City, had the burden, at the administrative level, of proving that an exception to the Class 1 exemption from CEQA applied. (*Apartment Assn., supra,* 90 Cal.App.4th at p. 1175; *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 728 [3

Cal.Rptr.2d 488] (*Ukiah*).) This is because once an agency, such as City, determines, based on substantial evidence in the record, that the project falls within a categorical exemption, as City did here, the burden shifts to the challenging party (i.e., Chamber of Commerce) to " 'produce substantial evidence that the project has the potential for a substantial adverse environmental impact' " (*Apartment Assn., supra,* 90 Cal.App.4th at p. 1175; *Ukiah, supra,* 2 Cal.App.4th at p. 728); in other words, that one of the exceptions to categorical exemption applies.

If the agency then concludes that no exception to a categorical exemption is applicable, and the challenger sues, there is a split of authority on the appropriate standard of judicial review for the agency's decision that no Guidelines section 15300.2 exception to a categorical exemption is applicable. (*Fairbank, supra,* 75 Cal.App.4th at pp. 1259-1260, and cases cited there.) Some courts, relying on cases involving review of a negative declaration, have held that a finding of categorical exemption, *and* no exception thereto, cannot be sustained if there is a "fair argument," based on substantial evidence, that the project will have significant environmental impacts, even where the agency is presented with substantial evidence to the contrary. (See, e.g., *Azusa, supra,* 52 Cal.App.4th at pp. 1202-1204.)

Other courts apply an ordinary substantial evidence test to questions of fact related to the "significant effect" exception, thereby deferring to the express or implied findings of the local agency that, having found a categorical exemption applicable, it impliedly found no evidence to support application of an exception to the exemption. (See *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1601 [275 Cal.Rptr. 901]; *Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d at pp. 844-845.)[9] This application of the ordinary substantial evidence test is obviously a much more deferential standard, and as such, more favorable to the agency making the determination.

We need not decide which of these competing lines of authority is correct because, as discussed below, even under the standard of review least favorable to City, Chamber of Commerce has failed to demonstrate that there is substantial evidence sufficient to support a fair argument that "there is a reasonable possibility that the project will have a significant effect on

---

[9]Noting the existence of *Centinela* and *Dehne* as contrary authority, the court in *Ukiah, supra,* 2 Cal.App.4th 720, believed that "A reasonable case may be made that the 'fair argument' standard that clearly applies when reviewing a negative declaration is *not* the standard of review for a challenge to a decision that a project is categorically exempt. Rather, the traditional substantial evidence standard of review may be more appropriate." (*Id.* at p. 728, fn. 7, italics added.)

the environment," due either to cumulative impacts (Guidelines, § 15300.2, subd. (b)) or "unusual circumstances." (Guidelines, § 15300.2, subd. (c).)

b. *Even Under the "Fair Argument" Standard, There Is No Substantial Evidence That the Legislation Might Have a Significant Effect on the Environment*

Chamber of Commerce contends that there is substantial evidence that it is "readily apparent" that creation of PPZ XX *might* have a significant effect on the environment (*Apartment Assn., supra,* 90 Cal.App.4th at p. 1172), because of the cumulative impact of this PPZ in combination with all the past and future PPZ's and/or because of the "unusual circumstances" exception. We address this contention under the "fair argument" standard derived from the CEQA Guidelines.

CEQA defines "substantial evidence," as that term is used in the CEQA Guidelines, as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or *evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence.*" (Guidelines, § 15384, subd. (a), italics added.) "Substantial evidence shall include *facts,* reasonable assumptions predicated upon *facts,* and expert opinion supported by *facts.*" (Guidelines, § 15384, subd. (b), italics added.)

Because Chamber of Commerce relied on two specific exceptions to the exemption here, we must determine whether there was any such "substantial evidence" that would support application of the "cumulative impact" and/or the "unusual circumstances" exceptions. Put another way, did Chamber of Commerce present any facts, or inferences therefrom, or opinions based on facts, that would support a fair argument that the creation of the PPZ XX *might* have a significant effect on the environment?

1. *The "Cumulative Impact" Exception*

A categorical exemption is unavailable when a project is such that "the cumulative impact of successive projects of the same type in the same place, over time is significant." (Guidelines, § 15300.2, subd. (b).) The evidence showed that City had already adopted 49 PPZ's, and had scheduled a hearing

to adopt one more PPZ and to expand another, existing PPZ. Thus, there is substantial evidence of many of the elements of this exception: (1) successive projects (PPZ ordinances), (2) of the same type (PPZ's), (3) in the same place (within City's borders), and (4) over time. The critical question is whether there was substantial evidence of *any* environmental impact by PPZ XX, let alone of significant impact caused by the cumulative effect of PPZ XX when combined with the various existing and future PPZ's.

Chamber of Commerce's CEQA consultant, Chris Joseph, commented that the proposed PPZ XX "has the potential for significant environmental impacts in the areas of traffic, parking, air quality and fiscal effects," and that "the cumulative effect of existing and proposed PPZ's on these issue areas needs to be examined and evaluated in a comprehensive manner." But no *facts* were presented to support this expert opinion that PPZ XX might cause environmental impacts on traffic, parking, air quality and fiscal effects.

Chamber of Commerce urges that an "adverse parking effect" is itself an environmental impact, citing Guidelines, appendix G, section XI, subdivision (f) (which *is simply a sample question* that asks: "Would the project result in inadequate parking capacity?") and *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011 [280 Cal.Rptr. 478]. But these authorities are of no help to Chamber of Commerce, because they contemplate projects that *cause* inadequate parking capacity. For example, in *Sacramento Old City Assn. v. City Council, supra,* 229 Cal.App.3d 1011, the project was the expansion of a downtown convention center, which would result in more downtown visitors, and hence the need for more parking. The project here, in other words, the legislation, does not increase more visitors to the PPZ XX area, nor cause any need for *more* parking. Instead, it simply causes a reshuffling of existing users into existing parking spaces. To the extent that part of the underlying problem causing City to adopt this legislation might be inadequate parking, such inadequate parking already exists—and is not *caused* by the legislation.

Chamber of Commerce also contends that there was substantial evidence that "PPZ XX's adverse parking impacts will trigger corollary air quality, traffic and noise impacts—key areas of environmental concern." As noted above, there is no evidence that this legislation/project causes the kind of "adverse parking impacts" cognizable under CEQA, in other words, inadequate parking. It does not even result in an increase in parking that might arguably attract more traffic and the concomitant changes in noise and air quality.

The only "adverse parking impact" of the legislation is that it gives residents, versus commercial users, preferential parking at some unmetered spaces. While it can be inferred from this fact that the legislation may have an adverse *financial* impact on some persons and businesses, it cannot be inferred from this fact that the legislation may have any *environmental* impact. As noted above, "*evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence.*" (Guidelines, § 15384, subd. (a), italics added; see also *Ukiah, supra,* 2 Cal.App.4th at p. 734 ["[i]n examining this exception,[10] we must differentiate between adverse impacts upon *particular persons* and adverse impacts upon the environment of *persons in general.* As recognized by the court in *Topanga Beach Renters Assn. v. Department of General Services* (1976) 58 Cal.App.3d 188 [129 Cal.Rptr. 739]: '[A]ll government activity has some direct or indirect adverse effect on some persons. The issue is not whether [the project] will adversely affect particular persons but whether [the project] will adversely affect the environment of persons in general. (§ 21083, subd. (c).)' [Citation.]"] (italics added).)

Just as zero when added to any other sum results in no change to the final amount, so, too, when no environmental impacts cognizable under CEQA are added to the alleged environmental impacts of past projects, there is no cumulative increased impact. Accordingly, under even the least-deferential-to-the-agency's-decision standard of review, there is *no* substantial evidence supporting the application of the cumulative impact exception to this project.

### 2. The "Unusual Circumstances" Exception

A categorical exemption is unavailable when a project is such that "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) Chamber of Commerce has characterized the "unusual circumstances" in this case as (a) the "unusually large" size of PPZ XX (it is the second largest of City's more than 50 PPZ's); (b) the "unusually restrictive," in other words, lengthy, hours of regulation (the permit-only parking applies for 19 hours per day, seven days per week, whereas the regulations for most other PPZ's allegedly call for fewer hours of restricted parking); and (c) the "unusually diverse" mix of parking uses (the parking spaces in PPZ XX

---

[10]The particular exception being discussed in *Ukiah, supra,* 2 Cal.App.4th at page 734, was the "unusual circumstances" exception. However, we find the general principle relied upon in that case to be equally applicable to the "cumulative impacts" exception.

serve persons who have come to the area for nonprofit, commercial, academic and residential purposes).[11]

The two critical questions that must be answered to determine whether the "unusual circumstances" exception applies here are: (1) has Chamber of Commerce produced any evidence of any possible *causal connection* between any of these circumstances and a reasonable possibility of a significant effect on the environment? and (2) are any of these circumstances actually "*unusual* circumstances" *within the meaning of Guidelines section 15300, subdivision (c)*? A negative answer to either question means the exception does not apply. Because any one of these three "unusual circumstances" would suffice as an exception to the Class 1 exemption, we address these two questions as to each of the alleged unusual circumstances.

Is there any evidence of a causal connection between the "unusually large" size of PPZ XX and a reasonable possibility of a CEQA—cognizable significant effect on the environment? The answer is no. As noted above, the only possible impact of the project, regardless of the area it covers, is a change in the identity of the persons who may use the unmetered curbside parking spots. The legislation does not change the pool of potential users of parking or those users' reasons and need for parking, nor does it alter the number and/or location of parking spaces. The only possible impacts of the project are impacts that are not cognizable under CEQA—the above-noted social and/or economic impacts that do not contribute to, and are not caused by, physical impacts on the environment.

Is there any evidence of a causal connection between the "unusually restrictive" hours of regulation and a reasonable possibility of a CEQA-cognizable significant effect on the environment? Again, the answer is no, for the same reason noted above. While Chamber of Commerce suggested that the restrictions would somehow cause more "cruising" for parking spots (with accompanying traffic, noise and air quality problems), such suggestion was not supported by any facts. In fact, the more reasonable suggestion would be that as nonresidential users learn that entire residential streets are not available for legal parking, they will not waste time and gasoline cruising such streets for parking, nor risk fines for using illegal spaces. Rather, they will simply pay a small fee to park at legal, metered spaces on the nonresidential streets.

Is there any causal connection between the "unusually diverse" mix of parking uses and a reasonable possibility of a CEQA-cognizable significant

---

[11]Chamber acknowledges that City contends that this is not a particularly unusual mix of uses.

effect on the environment? Once again, the answer is no—again, for the same reason noted above. In fact, City's categorization of parking and parking users into residential and nonresidential is all that was necessary to deal with the problem it faced of how best to allocate parking in the PPZ. Chamber of Commerce produced no evidence that the parking differences between academic nonresidential users, commercial nonresidential users, nonprofit nonresidential users, or any other subcategory of nonresidential users was somehow relevant in considering any significant *environmental, versus social or economic,* impacts of the legislation.

The lack of any evidence of a causal connection between any of the allegedly "unusual circumstances" and a reasonable possibility of a CEQA-cognizable significant effect on the environment is, in and of itself, enough to foreclose any reliance on the "unusual circumstances" exception by Chamber of Commerce. We also note, however, that the specific "unusual circumstances" relied upon by Chamber of Commerce are not the kind of "*unusual* circumstances" required for the application of this exception, because whether a circumstance is "*unusual*" is judged relative to the *typical* circumstances related to an otherwise typically exempt project.

For example, in *Fairbank, supra,* 75 Cal.App.4th 1243, a city approved the construction of a proposed 5,855-square-foot retail/office building that was consistent with its general plan and zoning ordinances. It found the project was exempt under the then-categorical exemption for the new construction of small commercial structures in urbanized areas. (Guidelines, § 15303, subd. (c).) Fairbank challenged this exemption, contending that the "unusual circumstances" exception applied to require CEQA review.

The "unusual circumstances" asserted by Fairbank were that the building did not include adequate parking facilities, and that it would result in increased demand on city streets and other public parking areas, as well as an increase in traffic and circulation around the project site as potential users of the site attempted to find parking in the downtown area. The appellate court rejected this argument, finding Fairbank had made no showing of "unusual circumstances." It noted, "While the addition of any small building to a fully developed downtown commercial area is likely to cause minor adverse changes in the amount and flow of traffic and in parking patterns in the area, such effects cannot be deemed 'significant' without a showing of some feature of the project that distinguishes it from any other small, run-of-the-mill commercial building or use. Otherwise, no project that satisfies the criteria set forth in Guidelines section 15303(c) could ever be found to be exempt. There is nothing about the proposed 5,855-square-foot

retail/office building that sets it apart from any other small commercial structure to be built in an urbanized area, without the use of hazardous substances and without any showing of environmental sensitivity. (See Guidelines, § 15303(c).) In short, in the absence of any evidence of unusual circumstances nullifying the grant of a categorical exemption, there can be no basis for a claim of exception under Guidelines section 15300.2(c)." (*Fairbank, supra,* 75 Cal.App.4th at pp. 1260-1261.)

Also instructive on what kind of circumstance is "unusual" for purposes of the exception under Guidelines section 15300.2, subdivision (c) is *Ukiah, supra,* 2 Cal.App.4th at page 734. In that case, the City of Ukiah concluded that a Class 3 categorical exemption for construction of a single-family residence applied to a particular project, and that it was not trumped by a challenger's claim of "unusual circumstances" justifying application of the "unusual circumstances" exception.

On appeal, the appellate court agreed that there were no "unusual circumstances": "Neither the size of the house (2,700 square feet), nor its height, nor its hillside site is so unusual in the vicinity as to constitute the *type* of unusual circumstance required to support application of this exception. The house would have been exempt as a ministerial project (requiring only a building permit and no exercise of discretion by the City) but for the narrowness of the lot. Association argues that the project was unusual because the lot was nonconforming so that a site development permit was required. The lot width at the building set back line is 51 feet instead of the minimum 60 feet required by the Ukiah City Code. The lot *exceeds* the *minimum* single-family residential lot size in the City by more than 2,000 square feet and complies with side yard setback requirements. (Ukiah City Code, § 9019.) A site development permit was required only because the lot is nine feet narrower than the minimum lot width. Objections raised by the Association, however, relate to the height of the house and not its width. The potential environmental impacts which Association posits seem to us to be *normal and common considerations in the construction of a single-family residence and are in no way due to 'unusual circumstances.'*" (*Ukiah, supra,* 2 Cal.App.4th at p. 736, italics added.)

We think that the "unusual circumstances" relied upon here by Chamber of Commerce also involve the "normal and common considerations" any city might face when operating its public parking facilities and deciding how best to allocate its limited curbside parking in an area with competing user interests. Such "normal and common considerations" are *where* to impose parking regulations (the "unusually large size of PPZ XX"), *how* best to

regulate parking use (the "unusually restrictive" regulations), and *who* will be affected by the regulations (the "unusually diverse" mix of uses). These considerations—call them circumstances—without more (for example, "the use of hazardous substances" or "any showing of environmental sensitivity"; see, e.g., *Fairbank, supra,* 75 Cal.App.4th at p. 1260, referring to Guidelines, § 15303, subd. (c)), are not the type of "unusual circumstances" which require City to submit its proposed legislation to CEQA review.

### DISPOSITION

The order denying Chamber of Commerce's petition for a writ of mandate is affirmed. City is awarded its costs on appeal.

Klein, P. J., and Aldrich, J., concurred.