Filed 10/28/14  Paulek v. Dept. of Fish and Game CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ALBERT THOMAS PAULEK,  Plaintiff and Appellant,  v.  DEPARTMENT OF FISH AND GAME et al.,  Defendants and Respondents;  RAMONA DUCK CLUB,  Real Party in Interest and Respondent. | D065278  (Super. Ct. No. RIC 1104726) |

APPEAL from a judgment of the Superior Court of Riverside County, Gloria C. Trask, Judge.  Affirmed.

Susan Nash for Plaintiff and Appellant.

Kamala D. Harris, Attorney General and Eric M. Katz, Deputy Attorney General, for Respondents California Department of Fish and Game, and Wildlife Conservation Board.

No appearance for Respondent and Real Party in Interest Ramona Duck Club.

The Wildlife Conservation Board (Board) approved the Department of Fish and Game's (the Department) acquisition of a conservation easement[1] over a portion of property owned by real party in interest Ramona Duck Club (Duck Club). The Board determined the easement was exempt from the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[2] under categorical exemptions set forth in the Guidelines for Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq., hereafter Guidelines):[3] one pertaining to "acquisition of lands for fish and wildlife conservation purposes" (Guidelines, § 15313) and the other pertaining to "transfers of ownership of interests in land in order to preserve open space, habitat, or historical resources" (Guidelines, § 15325). The trial court denied Albert Paulek's petition for a writ of mandate to set aside the Board's exemption determination and entered judgment in favor of respondents and against Paulek.

Paulek concedes for purposes of this appeal that both categorical exemptions apply by their own terms, but contends the trial court erred by finding the "unusual

---

[1]    A conservation easement is a perpetual "limitation in a deed, will, or other instrument in the form of an easement . . . the purpose of which is to retain land predominantly in its natural, scenic, historical, agricultural, forested, or open-space condition." (Civ. Code, §§ 815.1, 815.2.)

[2]    All further statutory references are to the Public Resources Code unless otherwise indicated.

[3]    The Guidelines are regulations "prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of" CEQA. (Guidelines, § 15000; § 21083.) "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5.)

circumstances" exception to those exemptions (Guidelines, §15300.2, subd. (c)) inapplicable. Paulek also contends the conservation easement was ineligible for a categorical exemption because the Board improperly considered mitigation measures in making its exemption determination. We conclude Paulek failed to meet his burden of establishing the unusual circumstances exception applies or that the Board improperly considered mitigation measures. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The Duck Club is a private hunting club that owns approximately 92 acres of wetlands and uplands that it uses for hunting and passive recreation purposes (the Property). The Property is located 18 miles southeast of the City of Riverside, adjacent to Mystic Lake, and shares a common boundary with the state-owned San Jacinto Wildlife Area. The Mystic Lake area supports many species of amphibians, reptiles, and birds, and is home to threatened and endangered plants and animals. The parties agree the Property "is in a substantially undisturbed natural and open space condition and possesses natural, open space and habitat values which are of great importance to the people of the State of California . . . ."

The Board is an independent state board within the Department, each of which has its own distinct powers, purposes, and funding. (Compare Fish & G. Code, §§ 1320, 1345-1355 with id., §§ 703-713, 850-882, 1000-1019.) The Board is empowered by the Legislature to authorize the acquisition of real property by the Department for wildlife preservation purposes. (Fish & G. Code, §§ 1320, 1345, 1348, 1354.)

3

About 15 years ago, the Department identified the Property and surrounding properties as valuable natural wildlife habitat worthy of preservation. Board staff determined conservation of the Property was important because it would place nearly all of the southwestern shoreline of Mystic Lake under state protection.

On and off since 2008, the Board and the Duck Club discussed the state's potential acquisition of a conservation easement over the Property. These discussions accelerated after the County of Riverside in 2010 issued the Duck Club a conditional use permit (CUP) that allows "the operation of a hunting club specifically limited to the southerly two (2) acres" of the Property (the Club Property).[4] The CUP acknowledged the existence of 11 recreational vehicle (RV) parking spaces with patios, a tool shed, and a well on the Club Property. It allowed the expansion of the existing facilities by adding to the Club Property eight RV parking spaces with patios, two storage containers, 20 automobile parking spaces, two 7,500-gallon water storage tanks, a trap and skeet facility area, and portable restrooms. As a condition of the expansion of the facilities on the Club Property, the CUP (1) prohibited the use of lead shot on the entire 92-acre Property "for any and all hunting and/or practice activities," including "trap and skeet activities"; and (2) required the Duck Club to remove an iron gate from the northern entrance to the Property.

---

[4] According to the Riverside County Planning Department, hunting on the Property was allowed without a land use permit, but the operation of a hunting club facility was not.

On January 26, 2011, the Board gave public notice that it would consider at its February 24, 2011 public meeting whether to approve the acquisition of a conservation easement on a portion of the Property. Paulek and a group known as Friends of the Northern San Jacinto Valley (Friends), of which Paulek is a member and his counsel is a board member, each submitted written comments on the project throughout February 2011. They challenged the Duck Club's use of lead shot on the Conserved Property, the existence of the gate, and the conservation easement's inadequate protection of rare and endangered plants on the Property.

In mid-February, the Board and the Duck Club agreed on a final draft version of the conservation easement agreement (the Conservation Easement). The Conservation Easement perpetually extinguished the Duck Club's development rights over approximately 89 acres of the Property (the Conserved Property)—all but the two-acre Club Property.[5] The Conservation Easement specifically prohibited commercial activity on the Conserved Property "except such commercial uses as are associated with the continued use of [the Duck Club's] adjacent Club Property as a hunting club as authorized by [the CUP] or passive recreational uses . . . ." The Conservation Easement attached and incorporated by reference the CUP.

---

5    Paragraph 3 of the Conservation Easement provides in pertinent part that "[a]ll present and future development rights appurtenant to, allocated, implied, reserved or inherent in the Conserved Property are hereby released, terminated and extinguished."

5

The Conservation Easement did not grant the Duck Club any new rights, but did identify certain preexisting rights that the Duck Club "specifically reserves."[6] Key among those is the right to use the Conserved Property in connection with the Club Property, but only "as permitted by [the CUP]" and the terms of the Conservation Easement. Consistent with the CUP's prohibition on the use of lead shot on the Property, the Conservation Easement reserved to the Duck Club only the right to "shoot non-toxic ammunition from firearms."

The Duck Club provided a courtesy copy of the final draft Conservation Easement to Paulek and Friends on February 22. The next day, Paulek provided further written comments to the Board.

At the Board's February 24, 2011 public meeting, three people appeared in person to speak in favor of the Conservation Easement; no one spoke in opposition. The Board's Executive Director orally summarized Paulek's and Friends' written comments and responded to each issue point by point. The Duck Club's attorney informed the Board that the gate about which Paulek complained had been removed and that the Duck Club had amended its bylaws to prohibit the use of lead shot as required by the CUP. The Board unanimously approved acquisition of the Conservation Easement as proposed for $358,000.

---

[6] Under Civil Code section 815.4, "[a]ll interests not transferred and conveyed by the instrument creating the [conservation] easement shall remain in the grantor of the easement . . . ."

6

On March 2, 2011, the Board filed a Notice of Exemption from CEQA, stating the acquisition of the Conservation Easement was exempt under the Class 13 and Class 25 categorical exemptions.

On March 17, 2011, Paulek filed a petition for writ of mandate alleging two CEQA violations—one pertaining to public participation, the other to the Board's exemption determination.

On March 22, 2011, the Duck Club signed the final Conservation Easement.

On February 24, 2012, the trial court heard Paulek's writ petition. During the hearing, Paulek dismissed with prejudice his public-participation claim, leaving only his exemption-related claim. The trial court concluded the Class 13 exemption applies and Paulek "did not make a fair argument that the 'unusual circumstances' exception to the categorical exemption applies." The court issued a statement of decision on April 25, 2012, and entered judgment in favor of respondents and against Paulek on May 14, 2012.

Paulek timely appealed.

## I.

## LEGAL PRINCIPLES

The Board found, and Paulek concedes for purposes of this appeal, that the Class 13 and Class 25 categorical exemptions to CEQA apply to the Conservation Easement by their own terms. He now challenges only the determination that the so-called unusual circumstances exception to the categorical exemptions is inapplicable. He contends the

7

exception applies because the use of lead shot in nonhunting activities,[7] the Duck Club's previous erection of a gate, and the presence of rare and endangered plants on the Conserved Property are unusual circumstances that create a significant risk of adverse effects on the environment. He also contends the Conservation Easement's incorporation of the CUP's prohibition on the use of lead shot and the Board's consideration of the Duck Club's removal of the gate constitute mitigation measures that rendered the Conservation Easement ineligible for a categorical exemption. These arguments lack merit.

A.    *Legal Standards Applicable to Categorical Exemptions and Exceptions Under CEQA.*

CEQA establishes "a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 (*Davidon*).) This appeal involves the first tier, which "is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity." (*Ibid*.) "As part of the preliminary review, the public agency must determine the application of any statutory exemptions or categorical exemptions that would exempt the proposed project from further review under CEQA." (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 258 (*Banker's Hill*).) "[T]he Guidelines set forth a list of exempt categories or classes of projects which

_____

7    Paulek identifies these activities as "target, skeet, trap, and sporting clay" and distinguishes them from hunting because, unlike hunting, they have no season or bag limits.

8

have been determined by the Resources Agency not to have a significant effect on the environment." (*Davidon, supra*, 54 Cal.App.4th at p. 112.) "If the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary." (*Id.* at p. 113.)

Here, the Board found the Conservation Easement fell within the Class 13 and Class 25 categorical exemptions. "Class 13 consists of the acquisition of lands for fish and wildlife conservation purposes including (a) preservation of fish and wildlife habitat, (b) establishing ecological reserves . . . , and (c) preserving access to public lands and waters where the purpose of the acquisition is to preserve the land in its natural condition." (Guidelines, § 15313.) "Class 25 consists of the transfers of ownership of interests in land in order to preserve open space, habitat, or historical resources." (Guidelines, § 15325.)

"In categorical exemption cases, where the agency establishes that the project is within an exempt class"—as Paulek has conceded is the case for purposes of this appeal—"the burden shifts to the party challenging the exemption to show that the project is not exempt because it falls within one of the exceptions" identified in the Guidelines. (*Davidon, supra*, 54 Cal.App.4th at p. 115.) Paulek contends the unusual circumstances exception applies here. That exception applies "where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) The applicability of this exception involves two distinct inquiries: "[a] negative answer to either question means the exception does not apply." (*Santa Monica Chamber of Commerce v. City of Santa*

9

*Monica* (2002) 101 Cal.App.4th 786, 800 (*Santa Monica*).) "First, we inquire whether the [p]roject presents unusual circumstances." (*Banker's Hill, supra*, 139 Cal.App.4th at p. 278.) In this context, a project is unusual if it "differ[s] from the general circumstances of the projects covered by a particular categorical exemption." (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1207 (*Azusa*); *Santa Monica, supra*, 101 Cal.App.4th at p. 801 ["whether a circumstance is '*unusual*' is judged relative to the *typical* circumstances related to an otherwise typically exempt project"].) Whether a circumstance is unusual is a question of law this court determines de novo. (*Azusa, supra*, at p. 1207.)

Second, "we inquire whether there is a reasonable possibility of a significant effect on the environment *due to* the unusual circumstances[.]" (*Banker's Hill, supra*, 139 Cal.App.4th at p. 278.) This requires the project's challenger to produce "evidence of any possible *causal connection* between any of [the unusual] circumstances and a reasonable possibility of a significant effect on the environment." (*Santa Monica, supra*, 101 Cal.App.4th at p. 800.) Courts routinely find the exception inapplicable where this connection is lacking and the effects on the environment are caused, instead, by preexisting uses. (See, e.g., *Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 990-991 [exception inapplicable to sanitation district's purchase of property as a buffer between a treatment plant and nearby residences; "[t]he issue is whether the acquisition of the adjacent property will *alter* the amount or type of odors, fumes, or gases already emitted," and petitioners "pointed to nothing in the record which shows any *increase* or *modification* in the release of . . . noxious fumes"]; *Association for*

10

*Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 735 [exception inapplicable where complained-of water runoff existed before construction and there was no "evidence of an adverse impact from the *construction* of the . . . house"]; *San Lorenzo Valley Community Advocates for Responsible Educ. v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1392 [exception inapplicable to school district's closure of one school and transfer of affected students to another school with mold issues because "there is no indication that the presence of mold is a *change* in environmental conditions.  The mold was a preexisting condition . . . ."].)

There is a split of authority among appellate courts regarding how to review the second prong.  (*Banker's Hill, supra*, 139 Cal.App.4th at pp. 261, 262, fn. 12.)  Some courts—including a different panel of this court—apply a "fair argument" test, "review[ing] the record to determine whether it contained evidence of a fair argument that the project *may* have a significant effect on the environment."  (*Id*. at p. 262 & fn. 12 [collecting cases].)  Other courts apply a "traditional" substantial evidence review, "uphold[ing] an agency's decision if there is *any* substantial evidence in the record that there will be *no* significant effect on the environment."  (*Ibid*.)  For purposes of this appeal, we follow our court's conclusion that the less deferential fair argument test applies.

In reviewing a petition for writ of mandate in a CEQA case, our task is the same as the trial court's—"we examine the [Board]'s decision, not the trial court's."  (*Banker's Hill*, *supra*, 139 Cal.App.4th at p. 257.)

11

B.    *Analysis*

1.    *Paulek Has Not Established the Conservation Easement Presents Unusual Circumstances.*

Although we need not decide this issue because Paulek clearly fails to establish the second prong of the exception, we note Paulek has not produced any evidence that there is anything unusual about a conservation easement that reserves to the grantor (a hunting club) the continued right to use the conserved property for recreational shooting activities.  The Legislature specifically directs the Board to investigate areas that "are suitable for, or can be made suitable for, fishing and hunting" (Fish & G. Code, § 1345) and empowers the Board to "authorize the acquisition of such lands or rights in land as may be necessary for the purpose of furnishing public access to lands or waters open to the public for fishing, hunting *and shooting*."  (Fish & G. Code, § 1354, italics added.)  The Legislature further directs the Board to balance "the maximum restoration of wildlife in the state and . . . the maximum recreational advantages to the people of the state."  (Fish & G. Code, § 1347.)  In light of these directives, the Board's conclusion "the activities of the club are in harmony with the wildlife area" is reasonable and not unusual.

2.    *Paulek Has Not Made a Fair Argument that There Is a Reasonable Possibility of a Significant Effect on the Environment Due to Unusual Circumstances.*

Even assuming the circumstances that Paulek cites—the use of lead shot, the previous erection of a gate, and the presence of rare and endangered plants—qualify as unusual for a conservation easement, he has not made a fair argument that there is a

12

reasonable possibility of a significant effect on the environment *due to* any of those purported unusual circumstances. Without even examining the specific circumstances Paulek cites, it is apparent his argument fails conceptually due to the lack of causation. (Guidelines, § 15300.2, subd. (c); *Banker's Hill, supra*, 139 Cal.App.4th at p. 278; *Santa Monica, supra*, 101 Cal.App.4th at p. 800.)

By its very nature, the Conservation Easement cannot be the *cause* of the environmental effects of which Paulek complains. A conservation easement is merely a *limitation* on—not an expansion of—a landowner's use of its property. (Civ. Code, § 815.1 [" 'conservation easement' means any limitation in a deed . . . ."].) Consistent with the nature of an easement, any existing rights that are not restricted by a conservation easement are reserved to the landowner. (Civ. Code, § 815.4.) By definition, then, *reserved* rights are not *created by* a conservation easement. Thus, at a fundamental level, the Conservation Easement cannot be the cause of any environmental effects that result from the Duck Club's exercise of its reserved preexisting rights. This lack of causation becomes even more apparent when we consider the specific circumstances cited by Paulek.

   a.  *Lead Shot*

Paulek has not met his burden of making a fair argument that the use of lead shot for nonhunting purposes will have a significant effect on the environment *due to* the Conservation Easement. He misses the mark for at least two reasons. First, Paulek is complaining about a nonexistent circumstance. Although he appears to suggest the Duck Club may continue to shoot lead shot on the Conserved Property for nonhunting

activities, the record on appeal shows the opposite is true. For example, the CUP—

without which the Duck Club would have no right to engage in shooting activities other

than hunting—expressly prohibits the use of lead shot "for *any and all hunting and/or*

*practice activities*, which include, but are not limited to trap and skeet activities, *within*

*the entire contiguous ownership of the Ramona Duck Club* as shown on sheet two (2) of

APPROVED EXHIBIT A and as further detailed by APN's:  423-050-008, -025, and

423-040-017."[8]  (Italics added.)  In addition, the CUP expressly limits the Duck Club's

nonhunting shooting activities to the two-acre Club Property.  Therefore, the CUP clearly

prohibits the Duck Club from using lead shot for nonhunting shooting activities on the

Conserved Property.

The Conservation Easement itself also prohibits the use of lead shot on the

Conserved Property.  To begin with, the Conservation Easement expressly incorporates

the CUP's terms by reference.  In addition, the Conservation Easement reserves to the

Duck Club only the limited right to "shoot non-toxic ammunition from firearms."  Paulek

and respondents agree lead shot is toxic.

Taken together, the CUP and the Conservation Easement negate the very existence

of an unusual circumstance capable of having significant effects on the environment.

---

[8]    The record does not contain the referenced exhibit, but the APN's referenced in the CUP correspond to those identified elsewhere in the record as constituting the *entire Property*, not merely the two-acre Club Property.  Respondents also maintain that the CUP prohibits the use of lead shot throughout the Property.  The Duck Club has not filed a brief or otherwise expressed its view on this issue in this appeal, but has amended its bylaws to prohibit the use of lead shot as required by the CUP.

Second, even if the Duck Club were somehow permitted to use lead shot on the Conserved Property, it would not be because the Conservation Easement created that right, but rather, merely reserved it. The Conservation Easement "specifically reserves" to the Duck Club the right to "use and allow others to use the Conserved Property for uses associated with continued use of the adjacent Club Property as a hunting club as permitted by [the CUP], all in accordance with Legal Requirements and as consistent with the terms of this Easement, including, without limitation, to hunt and harvest wildlife, shoot non-toxic ammunition from firearms, conduct target practice, shoot skeet, trap, sporting clay, and other permitted hunting activities." To the extent Paulek contends this reservation of rights is the source of the Duck Club's right to shoot lead shot on the Conserved Property—a dubious contention in light of the reserved right to shoot only nontoxic ammunition—those reserved rights already existed and were not created or caused by the Conservation Easement.

In a related argument, Paulek asserts "[w]hat the Conservation Easement did that was 'unusual' was to reserve the right to apply for another [CUP]" in the future that theoretically would allow the Duck Club to expand its rights under the existing CUP to the Conserved Property. That argument is speculative and insufficient to carry Paulek's burden.

In short, Paulek has not made a fair argument that the Conservation Easement is the cause of any possible significant effects on the environment due to the use of lead shot for nonhunting shooting activities.

b. *The Gate*

Paulek also fails to make a fair argument that the Duck Club's previous erection of a gate excluding the public from the Property will have a significant effect on the environment *due to* the Conservation Easement. Because the gate was both erected and removed before the Duck Club ever granted the Conservation Easement, there is no causal connection between the two.

Paulek argues there is a continued risk to the environment because "the gate was not completely remove[d] (the posts remained) and even if the posts had been removed, the gate could be reconstructed at any time with no restrictions on the Ramona Duck Club through the Conservation Easement." We disagree. Not only is Paulek's argument unsupported speculation, the CUP required the Duck Club to remove the gate, and—as Paulek concedes—the Conservation Easement prohibits the Duck Club from erecting a new gate. Thus, Paulek has not made a fair argument there is a reasonable possibility that a gate that was both erected and removed before the Duck Club granted the Conservation Easement may have significant effects on the environment.

c. *Rare and Endangered Plants*

Paulek argues the presence of rare or endangered plants on the Conserved Property required the Board to make a "mandatory finding of significance" under the Guidelines. He further argues the Conservation Easement's reservation of all the uses under the CUP could have a significant effect on the environment. Neither argument has merit.

Guidelines section 15065, subdivision (a)(1) provides that an agency "shall find that a project may have a significant effect on the environment and thereby require an

16

EIR to be prepared for the project where there is substantial evidence, in light of the whole record, that . . . [¶] (1) *[t]he project has the potential* to . . . substantially reduce the number or restrict the range of an endangered, rare or threatened species." (Italics added.) The italicized portion of the quoted language shows that Paulek has failed to establish a causal connection between the Conservation Easement—which only serves to restrict what the Duck Club could otherwise do with the Conserved Property—and the potential adverse effects on rare or endangered plants.

Paulek underscores this lack of causation when he asserts it is the Conservation Easement's reservation of rights to the Duck Club that could potentially cause the adverse environmental effects. Because the reserved rights are the Duck Club's preexisting rights, the Conservation Easement did not create them and any adverse effects on the environment could not have been caused by the Conservation Easement.

In summary, Paulek has not made a fair argument that any of the circumstances of which he complains—to the extent they even exist—are *caused by* the Conservation Easement. Rather, it appears that although Paulek acknowledges the Conservation Easement restricts certain of the Duck Club's preexisting rights, it does not restrict them as much as Paulek would like it to. But that is not causation. Accordingly, we conclude Paulek has failed to meet his burden of establishing the unusual circumstances exception applies to the Conservation Easement.

3.      *The Board Did Not Mitigate Its Way Into an Exemption.*

Paulek argues the Conservation Easement's prohibitions on the use of lead shot, re-erection of the gate, and removal of plants were improper attempts by the Board to use

17

mitigation efforts to qualify the Conservation Easement for a categorical exemption for which it would otherwise not have qualified but for the mitigation. (See, e.g., *Azusa, supra*, 52 Cal.App.4th at p. 1199 [a project's eligibility for a categorical exemption must be determined without regard to any mitigation efforts].) The Board counters that Paulek has forfeited this argument because he did not (1) exhaust his administrative remedies by raising it during the Board's administrative hearing process, or (2) raise it with the trial court. Alternatively, the Board argues the contention fails on its merits because the Conservation Easement has no significant effects on the environment that require mitigation.

Regarding forfeiture, Paulek asserts he sufficiently raised the issue during the trial court's hearing on his writ petition. We agree. However, Paulek does not direct us to, nor has our independent review revealed, any evidence in the record indicating he ever raised this issue with the Board, as required to exhaust his administrative remedies. (§ 21177, subd. (a) ["An action or proceeding shall not be brought [under CEQA] unless the alleged grounds for noncompliance with this division were presented to the public agency . . . ."].) Moreover, it appears Paulek actually criticized an early draft of the Conservation Easement because it did not "recognize[] or incorporate[]" the CUP's restriction on the use of lead shot and requirement that the Duck Club remove the gate. Under the circumstances, Paulek has failed to exhaust his administrative remedies by first presenting to the Board his claim that the Conservation Easement improperly incorporates mitigation efforts that render it ineligible for a categorical exemption. (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216

18

Cal.App.4th 614, 623 [petitioner must present " ' " 'exact issue' " ' " to agency so agency has an opportunity to respond and eliminate the need for litigation].)

Even if we were to reach the merits of Paulek's mitigation argument, it would fail for a lack of causation. "A 'mitigation measure' is a suggestion or change that would reduce or minimize significant adverse impacts on the environment *caused by the project as proposed*." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 445, italics added; § 21002; Guidelines, § 15041, subd. (a) [mitigation measures must bear a " 'nexus' " and " 'rough proportionality' " to effects caused by project].) As we discussed at length above, Paulek confuses the environmental effects of the Duck Club's preexisting rights to use the Property with the Conservation Easement's restrictions on those rights within the Conserved Property. That is, to the extent the Conservation Easement "mitigates" any of the Duck Club's impacts on the Conserved Property, it is not doing so because they were caused by the Conservation Easement, but rather, because that is the Conservation Easement's very purpose—"the permanent preservation, protection, maintenance, restoration and enhancement of the Conserved Property, including wetlands, grasslands and habitats, in a natural and open space condition." Moreover, to the extent the Conservation Easement incorporates the terms of the CUP, those terms were rights and restrictions imposed by the County as the primary regulator of local land use rights before the Department acquired the Conservation Easement. (See, e.g., *Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 47 ["the general subject matter of land use planning is one that traditionally has fallen within the domain of local governmental entities"].)

By Paulek's reasoning, no conservation easement could ever qualify for a Class 13 or Class 25 categorical exemption because the easement's restrictions on the grantor's developmental rights would constitute "mitigation" efforts that make the easement ineligible for a categorical exemption. We conclude Paulek has failed to establish the Board improperly considered measures to mitigate the effects of the Conservation Easement in determining its eligibility for categorical exemptions.

DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.