[No. B144335. Second Dist., Div. Seven. July 23, 2001.]

APARTMENT ASSOCIATION OF GREATER LOS ANGELES et al.,
Plaintiffs and Appellants, v.
CITY OF LOS ANGELES, Defendant and Respondent.

**COUNSEL**

Straw & Gough, Lawrence J. Straw, Jr., Paul T. Gough; Kaplanis & Grimm and Trevor Grimm for Plaintiffs and Appellants.

James K. Hahn, City Attorney, Susan Pfann and Jack L. Brown, Assistant City Attorneys, for Defendant and Respondent.

**OPINION**

**JOHNSON, J.**—Petitioners, the Apartment Association of Greater Los Angeles (AAGLA) and Golden Bull, Inc., appeal from the denial of their petition for a writ of mandate halting a housing code enforcement program adopted by respondent city without an environmental impact report under the California Environmental Quality Act (CEQA).[1] We affirm.

FACTS AND PROCEEDINGS BELOW

Petitioners are a nonprofit association representing residential landlords throughout the city of Los Angeles and a landlord which owns and operates residential properties in the city.

The dispute in this case concerns the city's adoption of a systematic code enforcement program[2] which requires inspection of approximately 750,000 residential rental units at least once every three years and repair of any units found to be in violation of the city's building, safety, fire or health regulations. This program replaced an interim code enforcement program the city adopted the previous year.[3] Prior to the enactment of these "proactive" code enforcement programs, rental property was inspected only when the city received a complaint. (Under the permanent code enforcement program, the city will still respond to complaints.)

Petitioners appeared before the city council in opposition to the permanent code enforcement program. They took issue with the city's position the permanent program would not have a significant impact on the environment

---

[1] Public Resources Code section 21000 et seq. All future statutory references are to the Public Resources Code unless otherwise specified.

[2] City of Los Angeles Ordinance No. 173011 (adopted Dec. 17, 1999).

[3] Petitioners in the present case also challenged the interim program for failure to comply with CEQA requirements. The trial court denied their petition for writ of mandate and Division One of this court affirmed in an unpublished opinion. (*Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (May 8, 2000, B131279).)

and, therefore, an environmental impact report (EIR) was not required prior to adoption of the program. In support of their argument the program could have a significant effect on the environment, petitioners submitted declarations from two urban planners, Sims and Silvern, who had not testified concerning the interim code enforcement program. Petitioners' experts explained why, in their view, the code enforcement program was likely to "create significant environmental impacts within the meaning of [CEQA] by adversely affecting the city's affordable rental housing stock and ultimately the environmental setting of the city's neighborhoods." In summary, Sims concluded the program "could cause widespread foreclosure, abandonment and removal of affordable rental housing in the City of Los Angeles." Silvern concluded the volume of repair activity which would be generated by the program could significantly affect the environment through the transportation, use and disturbance "of potentially toxic and/or hazardous materials (e.g., pesticides, asbestos and lead paint," by permanently or temporarily displacing tenants, and by causing "changes to buildings that are of historic value." For these reasons, petitioners argued to the council, an EIR should be prepared.

Notwithstanding petitioners' objections, the city approved the permanent code enforcement program after concluding it was exempt from the requirements for an "initial study" and EIR under CEQA. As it did with the interim program, the city filed a "notice of exemption" with respect to the permanent program.

Following adoption of the ordinance creating the permanent code enforcement program, petitioners filed a timely petition in the superior court for a writ of mandate nullifying the ordinance. The petition challenged the city's finding the code enforcement program was exempt from environmental study under CEQA. Petitioners contended the program had the potential for significant environmental consequences and the city's finding to the contrary was not supported by substantial evidence or the law.

The trial court disagreed with petitioners. The court noted the current program was virtually "the same project" as the interim program and that it had upheld the city's finding the interim program was exempt from CEQA review in an action by these same petitioners raising the same issues. Because the two programs were virtually the same, the court held, an EIR was not required as to the current program unless "new information of substantial importance, which could not have been known with the exercise of reasonable diligence at the time of the previous [finding] is discovered." The declarations by the urban planners, Sims and Silvern, were not properly

before the city council, the court ruled, because there was no showing why they could not have been produced at the time the council considered the interim program. Therefore, the court found petitioners failed to produce any "new" evidence in opposition to the program. The court further held even if the experts' declarations were considered, the record contained substantial evidence to support the city's determination the project was exempt from CEQA review.

The trial court entered an order denying the petition for writ of mandate and petitioners filed a timely appeal.

Discussion

I. *Background: CEQA's Three-tiered Structure for Environmental Review.*

An explanation of CEQA's three-tiered structure for environmental review will aid in understanding the issues raised by the petitioners in this appeal.

If a project falls within a category exempted from environmental review by statute or administrative regulation, no further agency evaluation is required.[4] If the project is not categorically exempt, the agency undertakes an "initial study" of the project.[5] If this study demonstrates the project will not have a significant effect on the environment, the agency makes a "negative declaration" to that effect.[6] On the other hand, if the "initial study" determines the project may have a significant effect on the environment, an EIR is required.[7]

In the present case, the city council determined the permanent code enforcement program was categorically exempt from environmental review under the state and city CEQA guidelines.[8] On the motion adopting the permanent program the council found: "[T]his project . . . is categorically exempt from CEQA pursuant to Article VII, Section 1, Class 1, Category 4 of the City's CEQA Guidelines because the effect of the project is the

[4]Sections 21080, subdivision (d), 21084, subdivision (a); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66] (hereafter *No Oil*).
[5]CEQA guidelines at California Code Regulations, title 14, section 15063. Future references to the CEQA guidelines will be cited as "CEQA" followed by the referenced section in title 14 of the California Code of Regulations.
[6]Section 21080, subdivision (c).
[7]Section 21151.
[8]Section 21082 directs local agencies to develop their own guidelines, including guidelines for categorical exemptions. Under the statute, these local guidelines are valid so long as they are consistent with state regulations and the CEQA statute.

restoration or rehabilitation of deteriorated or damaged structures, facilities or mechanical equipment or systems to meet current standards of public health, safety or environmental protection[.]" The council further found the project is exempt under class 9, category 2 of the city's CEQA guidelines "because the project would allow a City department to inspect the quality, health or safety of a project[.]" And, finally, the council found "the project is exempt under Class 21, Category (a) of the State CEQA Guidelines because it is the enforcement of a law administered or adopted by the regulatory agency[.]"[9]

Having found the project exempt from further review, the city did not undertake an "initial study" or issue a negative declaration or EIR.

II. *The Judgment Rejecting Petitioners' Challenge to the Interim Code Enforcement Program Does Not Preclude Their Challenge to the Permanent Program.*

 Initially, the city argues the judgment on the merits denying petitioners' challenge to the interim code enforcement program precludes their challenge to the permanent program under the doctrine of collateral estoppel. The trial court took a slightly different approach holding petitioners could challenge the permanent program but not on the basis of their experts' declarations. We disagree with the city and the trial court as to the preclusive effect of the failed challenge to the interim program.

 The doctrine of res judicata precludes the parties from relitigating a cause of action which has been finally determined by a court of competent jurisdiction.[10] Under the doctrine, an issue necessarily decided in such prior litigation is conclusively determined as to the parties if it is involved in a subsequent lawsuit on a different cause of action.[11] Here the parties are the same but the cause of action is different because the present suit arises out of the city's adoption of a new, permanent code enforcement program to replace the interim program.

The city contends the doctrine of collateral estoppel bars petitioners' attack on the permanent code enforcement program because the permanent program "is for all intents and purposes the same as the [interim program]" and the issues raised with respect to the permanent program were considered and rejected in the prior litigation challenging the interim program. We find the programs and the issues are not the same.

---

[9]CEQA section 15321.

[10]*Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 810 [122 P.2d 892].

[11]*Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1015 [48 Cal.Rptr.2d 174].

Under CEQA, a "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency."[12] Ordinances passed by cities are clearly activities undertaken by a public agency and thus "projects" under CEQA.[13] Therefore, the interim and permanent code enforcement programs, adopted under separate ordinances, are not the same for purposes of CEQA because they are separate "projects."

Furthermore, a comparison of the interim and permanent programs shows they are not the same. The very fact one was temporary and the other is permanent is enough to distinguish them because the environmental impact of a short-term program may be much less significant than a program of indefinite duration.[14] There are other differences: the permanent program is broader in scope than the interim program,[15] it specifies a covered rental property is to be inspected at least once every three years, adds new provisions regarding rent increases and rent withholding, and sets inspection fees and penalties for nonpayment.

Because the programs are not the same, neither are the issues. While the issue in petitioners' previous action was whether the *interim* code enforcement program was exempt from environmental review under CEQA the issue in the present action is whether the *permanent* code enforcement program is exempt from such review.

The situation here is much like the one in *Chamberlin*. There the petitioner contended a city ordinance enacting a traffic control plan was invalid because the city had not filed an EIR. This writ petition was Chamberlin's second challenge to the traffic plan; his first petition filed eight months earlier had raised a similar objection to the city's adoption of the plan on a trial basis. The first petition was denied and the appeal dismissed as moot when the city adopted a permanent plan. The trial court dismissed Chamberlin's writ petition challenging the subsequent permanent plan on the ground the petition was barred by collateral estoppel. The Court of Appeal reversed. Explaining its decision, the court stated: "[T]he issues presented in the second action are not entirely the same as those raised by the first, for the reason that the first action concerned the trial plan while the second challenged the permanent plan. There are differences, albeit minor, between the

---

[12]Section 21065.

[13]60 Ops.Cal.Atty.Gen. 335, 338 (1977).

[14]*Chamberlin v. City of Palo Alto* (1986) 186 Cal.App.3d 181, 187 [230 Cal.Rptr. 454] (hereafter *Chamberlin*).

[15]For example, the interim program covered "apartment houses," whereas the permanent program specifically includes duplexes and triplexes.

configurations of the two plans. . . . Collateral estoppel does not apply where the issue previously litigated was not identical."[16] The court also rejected the city's argument the permanent plan was not a separate "project" under CEQA.[17]

For the reasons stated above, we conclude the petition before us is not barred by collateral estoppel.

The trial court took a different, but equally mistaken, approach to limiting petitioners' challenge to the permanent code enforcement program. The court concluded petitioners could challenge the new, permanent program but held the declarations of petitioners' experts were not properly before the city council and therefore would not be considered by the court in ruling on the writ petition.[18]

The reasoning which led the trial court to this ruling was as follows. First, the court found the interim and permanent code enforcement programs were the "same project." Next, equating the city's "notice of exemption" to a "negative declaration," the court found the city could not be required to prepare an EIR for the permanent program unless substantial changes were proposed in the project or new evidence came to light which could not have been known with reasonable diligence at the time a negative declaration was prepared regarding the interim program.[19] The court then concluded that because the city proposed no substantial changes from the interim program and because petitioners failed to show their experts' declarations could not, with reasonable diligence, have been obtained and presented to the city council at the time it considered the interim program, the experts' declarations could not be considered in determining whether an environmental review was required for the permanent program.

We explained above why the interim and permanent code enforcement programs are not "the same project." The trial court also erred in equating

---

[16]*Chamberlin, supra* 186 Cal.App.3d at page 187. See also *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 878-880 [274 Cal.Rptr. 720], holding distinctions between two drilling plans precluded application of collateral estoppel.

[17]*Chamberlin, supra,* 186 Cal.App.3d at page 188.

[18]The trial court also ruled that even if the declarations could be considered on the merits of the CEQA exemption issue, the declarations did not overcome the substantial evidence supporting the exemption. We discuss this issue in part IV, *post.*

[19]CEQA section 15162.

the city's notice of exemption to a negative declaration and then applying the rules regarding the need for an EIR subsequent to a negative declaration.[20]

■ A notice of exemption is a notice filed "[w]hen a public agency decides that a project is *exempt* from CEQA[.]"[21] Filing a notice of exemption triggers a 35-day limitations period on legal challenges to the agency's decision the project is exempt. If no notice of exemption is filed, a 180-day limitations period applies.[22] A notice of exemption has no significance other than to trigger the running of the limitations period.[23]

A negative declaration, on the other hand, is a "written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report."[24] A negative declaration is only applicable in the case of a project which is *not* exempt from environmental study under CEQA.[25] As our Supreme Court explained in the *No Oil* case, "If a project falls within a category exempt by administrative regulation . . . or 'it can be seen with certainty that the activity in question will not have a significant effect on the environment' . . . *no further agency evaluation is required.*"[26]

In the present case, the city found the permanent code enforcement program was categorically exempt from environmental review under the city's CEQA guidelines. Because the city treated the permanent program as categorically exempt from environmental review, it did not prepare a negative declaration or an EIR. Thus the regulation relied on by the trial court,[27] which limits the circumstances in which new evidence can be considered after the certification of an EIR or the adoption of a negative declaration, is inapplicable to this case.

In summary, the issue presented in this case is whether the city properly exempted the permanent code enforcement program from environmental review under CEQA. Petitioners are not estopped from raising this issue by reason of the judgment against them in their challenge to the interim program and the evidence in their experts' declarations was properly before

[20]CEQA section 15162.
[21]CEQA section 15062, subdivision (a), italics added.
[22]CEQA section 15062, subdivision (d).
[23]For this reason it is irrelevant whether, as petitioners contend, the notice of exemption in this case failed to include all that it should under the CEQA guidelines. The petitioners filed their petition well within the 35-day limitations period.
[24]Section 21064.
[25]*No Oil, supra,* 13 Cal.3d at page 80.
[26]*No Oil, supra,* 13 Cal.3d at page 74, italics added.
[27]CEQA section 15162.

the city council and should be considered in reviewing the council's exemption decision.

### III. *The City Was Not Required to Conduct an "Initial Study" to Determine Whether the Code Enforcement Program Was Categorically Exempt from CEQA Review.*

In reviewing the city's determination a project falls within a categorical exemption the trial court's task, and ours, is to determine whether the city proceeded in a lawful manner and its findings are supported by substantial evidence.[28]

On the first issue, petitioners contend the city did not proceed in the manner required by law because a finding a project is exempt from CEQA review requires an "initial study" to determine its environmental effects as we held in *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.*[29] In making this argument, petitioners rely on our statement in *East Peninsula* "the amount of analysis and study involved at the preliminary review stage of determination of whether a project is exempt from CEQA may be similar to that involved at the 'second' stage where the agency conducts an initial study to determine whether the project has a significant effect on the environment [citation]."[30]

■ Contrary to petitioners' interpretation, we did not hold in *East Peninsula* an agency always must conduct an "initial study" before declaring a project exempt from CEQA review. Such a holding would run counter to the three-tiered structure of CEQA review under which, if a project is categorically exempt "no further agency evaluation is required" and no "initial study" takes place.[31] *East Peninsula* was decided on the basis of the unique provision in section 21080.18, which states CEQA does not apply to the closing of a public school or the transfer of its students "if the only physical changes involved are categorically exempt under [regulations adopted by the Secretary of Resources]." We interpreted this statutory

---

[28]Section 21168.5; *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 821 [17 Cal.Rptr.2d 766].

[29]*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 173 [258 Cal.Rptr. 147] (hereafter *East Peninsula*).

[30]*East Peninsula, supra*, 210 Cal.App.3d at page 173.

[31]*East Peninsula, supra*, 210 Cal.App.3d at page 163; and see *No Oil, supra*, 13 Cal.3d at page 74; *City of Pasadena v. State of California, supra*, 14 Cal.App.4th at page 820.

language to incorporate not only the regulatory exemptions but the regulatory *exceptions* to the exemptions.[32] One such exception applies "when the cumulative impact of successive projects of the same type in the same place, over time is significant."[33]

Thus, in determining whether a school closure was exempt from CEQA review we held the school board was required to determine whether the cumulative impacts from the closing of the school and the transfer of its students would have a significant effect on the environment.[34] We also noted the school board was well aware of numerous negative impacts on the environment which would result from closing the school in question, and it was also aware future school closings would probably have to occur in the not-too-distant future. It would exalt form over substance, we observed, to allow the school board to proceed with the closing based on mere technical compliance with the exemption statute and ignore potentially significant environmental consequences.[35]

The present case does not involve the statutory school closing exception. Therefore, the kind of second tier analysis, or "initial study," we required in *East Peninsula* does not apply here. However, even if such an analysis was required the requirement was satisfied by the city's study and report on the interim code enforcement program which we discuss below.

IV. *Substantial Evidence Supports the City's Finding the Permanent Code Enforcement Program Is Categorically Exempt from CEQA Review.*

■ The city found the permanent code enforcement program was exempt from CEQA review under the city's CEQA guideline, article VII, section 1, class 1, subdivision 4.[36] Substantial evidence supports this finding.

Article VII, section 1 exempts certain projects from CEQA review "provided such categorical exemptions are not used for projects where it can be readily perceived that such projects may have a significant effect on the environment." Class 1 applies to existing facilities and consists of projects involving "the operation, repair, maintenance or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that previously existing." Subdivision 4 of class 1 exempts projects consisting of the

---

[32]*East Peninsula, supra,* 210 Cal.App.3d at page 166.
[33]CEQA section 15300.2, subdivision (b).
[34]*East Peninsula,* 210 Cal.App.3d at page 172.
[35]*East Peninsula, supra,* 210 Cal.App.3d at pages 172-173.
[36]We will refer to this exemption as the class 1(4) exemption.

"[r]estoration or rehabilitation of deteriorated or damaged structures, facilities or mechanical equipment systems to meet current standards of public health, safety and environmental protection."

From our review of the record, the permanent code enforcement program is a project designed to accomplish the "restoration or rehabilitation of deteriorated or damaged structures" by bringing those structures up to code standards for the health, safety and protection of all the residents of Los Angeles. The project accomplishes this goal through routine inspection of the majority of Los Angeles rental housing, requests for voluntary compliance and criminal, civil or administrative penalties and fines if compliance is not forthcoming. Thus, the program on its face appears to fall within the class 1(4) exemption quoted above.

Petitioners argue, however, appearances can be deceiving and the permanent program does not fit within the class 1(4) exemption, nor is there sufficient evidence the program will "have [no] significant effect on the environment."

In petitioners' view, the city is taking a wide-ranging "proactive" code enforcement program involving the inspection and rehabilitation of 750,000 rental units and the demolition of some and attempting to squeeze it into a categorical exemption intended for occasional, owner-initiated "minor alterations" to existing structures to bring them up to current code standards. The class 1(4) exemption, petitioners contend, was not intended to cover the wide-scale demolition and removal of rental units and the massive displacement of tenants who occupy these structures which will result from the permanent code enforcement program adopted by the city.

Petitioners base this argument on the analysis of the *interim* code enforcement program prepared by their expert, Sims. Sims predicted many owners of buildings cited for code violations would not be able to afford to make the mandated repairs and instead would abandon their properties or remove them from the rental market thereby depleting the supply of affordable housing in Los Angeles and displacing a great many tenants from their homes.

The city's study of what actually occurred under the interim program contradicted Sims's predictions. Seven thousand two hundred rental properties consisting of 99,000 units were inspected during the first 14 months the interim program was in effect. Of these 7,200 properties orders of abatement were issued to 269 (approximately 4 percent). Of the 269 properties, 100 had been brought into compliance at the time of the study. Approximately 33

tenants were displaced from their rental units out of the 99,000 units inspected.

We see nothing in the changes incorporated into the permanent program to suggest its results will be markedly different from the interim program nor have petitioners submitted any evidence, expert or otherwise, that this would be the case.

It is also worth noting petitioner AAGLA, which claims it has "thousands of members who own and/or operate residential rental property in the City" failed to submit a single declaration from a member who claimed the interim enforcement program forced her to abandon her property or withdraw it from the rental market or that the interim program imposed a financial hardship.

Petitioners next argue even if there is substantial evidence the permanent code enforcement program comes within the class 1(4) exemption, "[a]n agency must next determine whether the project falls under one or more of the applicable exceptions to the categorical exemptions." We reject this argument for two reasons. Petitioners, not the city, have the burden of proving by substantial evidence an exception to the exemption applies. Petitioners failed to meet that burden.

Once an agency determines based on substantial evidence in the record that the project falls within a categorical exemption, as the city did here, the burden shifts to the challenging party to "produce substantial evidence that the project has the potential for a substantial adverse environmental impact."[37] Petitioners produced no such evidence.

We explained above why petitioners failed to produce substantial evidence of a significant environmental impact from the abandonment or withdrawal of rental housing. We now consider petitioners' second argument.

According to petitioners' expert, Silvern, the three-year code enforcement cycle will require landlords to undertake construction or repair activities "in *potentially* tens of thousands of apartment and other buildings throughout Los Angeles each year." This will have a significant effect on the environment because these construction and repair projects will involve "use [of] hazardous chemicals to control pests and rodents, and *potentially* disturb hazardous building materials (e.g., asbestos and lead paint) in older structures." Silvern goes on to state, "This construction and repair activity *may*

---

[37]*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 728 [3 Cal.Rptr.2d 488].

*occur*, to one degree or another" in every rental unit subject to inspection each year and *"it is reasonable to assume"* this construction and repair will occur in units needing "major repair" or which have "severe" physical problems which he estimates as approximately 100,000 rental units in the city of Los Angeles. (Italics added.)

We do not believe an expert's opinion which says nothing more than "it is reasonable to assume" that something "potentially . . . may occur" constitutes the substantial evidence necessary to invoke an exception to a categorical exemption. "Substantial evidence" is defined in the CEQA guidelines to include "expert opinion supported by facts." It does not include "[a]rgument, speculation, unsubstantiated opinion or narrative."[38] Thus, petitioners failed to meet their burden of proof an exemption trumps the city's finding of a categorical exception to CEQA review.[39]

DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Boland, J.,* concurred.

On August 8, 2001, the opinion was modified to read as printed above.

---

[38] CEQA section 15064, subdivision (f)(5).

[39] Silvern's opinion that the code enforcement program might adversely change a historical building (see CEQA § 15300.2, subd. (f)) is also pure speculation with no evidentiary support. We also note that even assuming AAGLA's opposition to the permanent program constitutes a "public controversy" over the program, petitioners are incorrect in claiming there is a "public controversy" exception to the categorical exemptions. See *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1358-1359 [272 Cal.Rptr. 372].

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.