Filed 3/29/16  T.C.E.F. v. County of Kern CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| T.C.E.F., INC., et al.,<br><br>  Plaintiffs and Respondents,<br><br>  v.<br><br>COUNTY OF KERN,<br><br>  Defendant;<br><br>HIGHWAY 99 COLLECTIVE COOPERATIVE INC.,<br><br>  Appellant. | F070043<br><br>(Super. Ct. No. S-1500-CV-277453)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

D|R Welch Attorneys at Law, David R. Welch; Dake, Braun & Monje and Richard A. Monje for Appellant.

Channel Law Group, Jamie T. Hall and Julian K. Quattlebaum for Plaintiffs and Respondents.

No appearance for Defendant.

-ooOoo-

In June 2012, the voters of Kern County[1] approved Measure G, an ordinance that authorized medical marijuana dispensaries but restricted them to areas zoned for industrial use. Ironically, the validity of Measure G was challenged by a group of medical marijuana dispensaries that were operating in areas zoned for commercial use, an area approved for dispensaries under an earlier ordinance. The dispensaries alleged that County erroneously determined Measure G was exempt from environmental review and violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[2] by failing to conduct an initial study of the measure's environmental impacts.

The trial court agreed with the plaintiffs, concluding County erred when it relied on the common sense exemption set forth in Guidelines section 15061, subdivision (b)(3).[3] The court gave County an opportunity to correct the deficiency, citing this court's decision in *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681 (*POET*). County's attempt at compliance was unsuccessful and the trial court subsequently invalidated Measure G.

This appeal was filed by a nonparty medical marijuana dispensary that contends it was adversely affected by the order invalidating Measure G because it had complied with the Measure G ordinance and was operating lawfully under its provisions in an industrial zone area. The dispensary argues Measure G should be reinstated because CEQA exemptions applied—either the common sense exemption or two categorical exemptions.

We conclude that there is a possibility that Measure G may have a significant effect on the environment and, therefore, the common sense exemption does not apply.

---

[1]    This opinion uses "Kern County" to refer to the geographical area. The governmental entity known as the County of Kern is referred to as "County."

[2]    All unlabeled statutory references are to the Public Resources Code.

[3]    "Guidelines" refers to the regulations promulgated to implement CEQA and set forth in California Code of Regulations, title 14, section 15000 et seq. (§ 21083.)

Measure G itself states that "Medical Marijuana Dispensaries have serious secondary effects on the community," including increased traffic, noise and litter. Not all of these potential impacts will be reduced or avoided by Measure G's operating restrictions, as argued by Measure G's proponents, because it is reasonably foreseeable that some dispensaries will relocate outside Kern County and, thus, will not be subject to Measure G's operating restrictions. These reasonably foreseeable relocations to areas outside of Kern County, coupled with the explicit finding about serious effects that dispensaries "have" (not "might have"), prevents County from stating with *certainty* that there is *no possibility* that Measure G may have a significant environmental impact at the locations where the dispensaries relocate. As a result, the common sense exemption cannot be applied to Measure G.

We therefore affirm the order invalidating Measure G.

**FACTS**

*Plaintiffs and Respondents*

This mandamus proceeding was initiated by 14 plaintiffs—seven California corporations and seven individuals residing in Kern County. The corporations were (1) T.C.E.F., Inc., which did business as All Green Collective; (2) Green Cross Collective of Kern County, Inc.; (3) Organic Health Solutions, Inc.; (4) The Healing Co-Op, Inc.; (5) V & G Collective, Inc.; (6) Top Shelf Medicine, Inc.; and (7) Bakersfield Alternative Medicine Cooperative, Inc. The individual plaintiffs are Juan-Carlos Chavez, David Abbasi, David Jensen, Saundra Henry, Faiz T. Munassar,[4] Eduard Petrosyan, and Jeffrey G. Jarvis. These individuals alleged that they were "qualified patients" as that term is defined in the Medical Marijuana Program Act (MMPA) (Health & Saf. Code, § 11362.7 et seq.).

---

[4] Faiz T. Munassar is referred to as "Tony F. Monassar" in Case No. F070813. His surname also can be spelled "Munnassar."

3.

Not all of the plaintiffs are respondents in this appeal. The respondents are limited to (1) Organic Health Solutions, Inc., (2) V & G Collective, Inc., and (3) the seven individual plaintiffs. The other five corporations have had their corporate powers suspended by the California Secretary of State. (See *Palm Valley Homeowners Assn. Inc. v. Design MTC* (2000) 85 Cal.App.4th 553, 556 [suspended corporations are "disabled from participating in litigation activities"]; Corp. Code, § 2205; Rev. & Tax. Code, § 23301.) In response to this court's inquiry about the suspended corporations, counsel for respondents submitted a letter stating that the suspended corporations do not intend to participate in this appeal, thus implying that the principals are not in the process of reviving of those corporations. (See generally, *Bourhis v. Lord* (2013) 56 Cal.4th 320, 323 [revival of corporate powers validates notice of appeal filed when corporate powers were suspended]; Rev. & Tax. Code, § 23305 [certificate of revivor].)

*Defendant and Appellant*

County, the only defendant named by plaintiffs, is not participating in this appeal. Instead, the sole appellant is Highway 99 Collective Cooperative Inc. (HWY 99), a company that was not named as a party in the mandamus proceedings. HWY 99 first appeared in the trial court proceeding when it filed a motion to set aside the order invalidating Measure G and claimed standing to bring the motion as an aggrieved nonparty. HWY 99 asserted it had an immediate and substantial pecuniary interest in the validity of Measure G because (1) it was lawfully operating under Measure G's provisions and (2) it believed it was the only medical marijuana dispensary approved by County to operate lawfully within the unincorporated area of Kern County.

*County's Early Ordinances*

In July 2006, County adopted its first medical marijuana dispensary ordinance, which was codified as chapter 5.84 to title 5 of the Kern County Ordinance Code (Ordinance Code) and entitled "Medical Marijuana Dispensaries." The ordinance allowed medical marijuana dispensaries granted a license by the County's sheriff's

4.

department to operate if they followed certain operating and record keeping requirements. The ordinance limited the number of licensed dispensaries to six and treated each dispensary "as a pharmacy for zoning purposes."

In March 2009, County adopted Ordinance No. G-7849, which repealed all of the provisions in the 2006 ordinance and set forth a new section 5.84.010 in chapter 5.84 of the Ordinance Code (2009 Ordinance). Under the 2009 Ordinance, most of the restrictions on medical marijuana dispensaries were removed. The new section 5.84.010 of the Ordinance Code stated that a medical marijuana dispensary could not be located within 1000 feet of a school and continued to treat each dispensary "as a pharmacy for zoning purposes."

*Moratoria on New Dispensaries*

In August 2010, County adopted Ordinance No. G-8079, an interim urgency ordinance that imposed a 45-day moratorium on the establishment of any new medical marijuana dispensaries and prohibited existing medical marijuana dispensaries from relocating within Kern County. When County adopted the moratorium, it recognized that at least 30 medical marijuana dispensaries were legally established and operating in Kern County. Other than the 2009 Ordinance's requirement that the dispensaries be located more than 1000 feet from a school, these dispensaries were subject to little regulation by County.

In October 2010, County extended the 45-day moratorium for the balance of one year. While the moratorium was in effect, County held workshops where members of the public could present their views on medical marijuana dispensaries and the policy choices confronting County.

On August 2, 2011, County held a public hearing on an additional extension of the moratorium. The staff report for this public hearing discussed a proposed extension of the moratorium and proposed ordinances to ban medical marijuana dispensaries and

5.

outdoor cultivation of marijuana. At the conclusion of the hearing, County's board of supervisors voted to extend the moratorium for an additional year.

*Ordinance Banning Dispensaries*

On August 9, 2011, County's board of supervisors held another public hearing on the proposed ordinance banning dispensaries. The staff report for the hearing stated that the proposed ordinance banning dispensaries was not subject to CEQA. About 20 minutes were devoted to public comments, with each person being limited to two minutes. At the end of the hearing, the board voted to adopt the proposed ordinance banning dispensaries.

The ordinance was designated Ordinance No. G-8191 (Dispensary Ban Ordinance). It amended chapter 5.84 of the Ordinance Code in its entirety with the express purpose of prohibiting "the operation of Medical Marijuana Collectives and the sale and distribution of any edible products containing Medical Marijuana." The ordinance stated it would take effect and be in full force on September 9, 2011 (i.e., 30 days after adoption).

On August 11, 2011, a notice of exemption was filed with the County's clerk. It stated that the Dispensary Ban Ordinance was exempt from CEQA pursuant to Guidelines section 15061, subdivision (b)(3) based on the board of supervisors' determination that it could be seen with certainty that there was no possibility that the ordinance might have a significant effect on the environment.

*Referendum Petition Protesting Ban*

Before the Dispensary Ban Ordinance became effective, County received a referendum petition with 26,335 signatures protesting four provisions of that ordinance. A County official examined the petition and certified that it contained a sufficient number of signatures. By operation of Elections Code section 9144, the four protested sections of the Dispensary Ban Ordinance were suspended. The suspended sections set forth the purpose and intent of the Ordinance, banned medical dispensaries, banned edibles

containing medical marijuana, and declared medical marijuana dispensaries to be a public nuisance subject to abatement. Pursuant to Elections Code section 9145, County was required to respond to the protest petition by (1) entirely repealing the ordinance or (2) submitting the ordinance to the voters at (a) the next regularly scheduled county election or (b) a special election called for that purpose.

*County's Response to the Petition*

On September 27, 2011, and February 21, 2012, County held public hearings to address its options for responding to the referendum petition and to receive public testimony on the issues presented. The staff report for the latter hearing (1) discussed recent legislation and judicial decisions addressing the regulation of medical marijuana dispensaries; (2) proposed an alternative ordinance (Measure G)[5] restricting and regulating medical marijuana dispensaries, rather than banning them outright; and (3) set forth options for the board of supervisors to consider. Those options were (1) repeal the Dispensary Ban Ordinance; (2) place the Dispensary Ban Ordinance on the June 5, 2012, primary election ballot; (3) repeal the Dispensary Ban Ordinance and place Measure G, the alternative ordinance, on the June 5, 2012, primary election ballot; or (4) place *both* the Dispensary Ban Ordinance and the alternative ordinance on the June 5, 2012, primary election ballot.

Near the end of the February 21, 2012, hearing, County's board of supervisors voted to place Measure G on the June 5, 2012, primary election ballot. A week later, also in response to the referendum petition, the board of supervisors adopted Ordinance No. G-8257 (Repeal Ordinance), which stated that "Chapter 5.84 of Title 5 of the Kern County Ordinance Code is hereby repealed in its entirety." The Repeal Ordinance did

---

**5** The alternative ordinance was labeled Measure G when it was presented to the voters.

7.

more than abrogate the Dispensary Ban Ordinance—it also left no provision in the Ordinance Code authorizing medical marijuana dispensaries to operate in Kern County.

The appellate record lacks any document, such as a notice of exemption or a hearing transcript, showing County's board of supervisors explicitly determined that its actions in presenting Measure G to the voters and in approving the Repeal Ordinance were exempt from CEQA.

*Approval of Measure G*

Measure G appeared on the June 5, 2012, primary election ballot as: "Shall a County zoning ordinance be adopted that amends Title 19 of the Ordinance Code to restrict the location of Medical Marijuana Dispensaries to Medium (M-2 PD) and Heavy (M-3 PD) Industrial Districts and to require them to maintain a distance of at least one (1) mile from all schools, daycare centers, parks, churches, and other Medical Marijuana Dispensaries, and to require them to operate in compliance with development and performance standards?"

Voters approved Measure G by casting 69,530 "Yes" ballots and 31,168 "No" ballots. County's board of supervisors subsequently designated the measure as "Ordinance No. G-8299" and directed its provisions be added to the Ordinance Code as chapter 19.120 of title 19. Title 19 is referred to as the Zoning Ordinance of Kern County.

The first section of Measure G stated its purpose was to "regulate the location, operation and establishment of Medical Marijuana Dispensaries, in order to promote the health, safety, and general welfare of the citizens of the County." That section also addressed the impacts of dispensaries by stating:

> "Medical Marijuana Dispensaries have serious secondary effects on the community. These secondary effects include, but are not limited to the following: criminal activity, loitering, increased traffic, noise, litter and a loss of trade for other businesses located nearby by interference. If not properly regulated, Medical Marijuana Dispensaries are harmful to the

8.

welfare of the surrounding community and its residents and can constitute a public nuisance."

The first section of Measure G also stated that a medical marijuana dispensary not in full compliance with the ordinance's provisions was prohibited and declared to be a public nuisance subject to nuisance abatement and administrative penalties.

Other provisions in Measure G (1) restricted the location of medical marijuana dispensaries to Medium (M-2 PD) and Heavy (M-3 PD) Industrial Districts; (2) required dispensaries to be located at least one mile away from all schools, daycare centers, parks, churches, and other dispensaries; (3) required dispensaries to operate in compliance with certain development and performance standards; and (4) required submission and approval of a site development plan before a dispensary could be established or altered. The standards banned the consumption of marijuana or alcohol on the dispensary's premises, the use of mobile or portable structures, patio seating, and operation between the hours of 8:00 p.m. and 10:00 a.m. The performance standards set forth requirements for trash dumpsters, off-street parking, exterior lighting, and signage.

Measure G also provided that any person or responsible party violating its provisions would be guilty of a misdemeanor and subject to a maximum of six months in jail or a fine of $1,000. In addition, County was authorized to enforce the provisions of Measure G by civil suit.

## PROCEDURAL HISTORY

*Writ of Mandate Challenge to Measure G*

In August 2012, about 45 days after Measure G became effective plaintiffs, commercial zone dispensary operators, filed a petition for writ of mandate and complaint for damages against County. Plaintiffs alleged, among other things, that County violated CEQA by placing Measure G on the ballot and subsequently implementing its provisions without conducting an initial study.

9.

In 2013, the parties filed briefs addressing the merits of the petition for writ of mandate and, in August 2013, the trial court held a hearing on the petition. Near the end of the hearing, the court (1) stated it was granting the petition, (2) set a further hearing in September 2013 limited to the scope of relief to be provided in the writ, and (3) established a schedule for filing supplemental briefs before that hearing.

During the September 2013 hearing on the scope of relief, the trial court quoted extensively from parts of this court's decision in *POET*, *supra*, 218 Cal.App.4th 681, that addressed section 21168.9 and the judicial remedies available for CEQA violations.

*Trial Court's Order Granting Writ of Mandate*

On October 10, 2013, the trial court filed its written order granting the petition of writ of mandate on the ground there was no substantial evidence in the record that County determined Measure G was exempt from CEQA pursuant to the common sense exemption in Guidelines section 15061, subdivision (b)(3). As to the remedy, the court preserved the status quo by allowing Measure G to remain in operation until County had a chance to complete a preliminary review and determine whether Measure G was exempt from further environmental review under CEQA.

*County's Response to Writ*

The peremptory writ of mandate was issued on November 20, 2013. Within the prescribed 30 days, County filed its return to the writ describing the actions taken to bring Measure G into compliance with CEQA. Simultaneously, County filed a motion to discharge the writ. County's return stated it conducted a preliminary review[6], determined Measure G was exempt from CEQA, and filed a notice of exemption with a statement of

---

[6] CEQA's first stage is known as a preliminary review and addresses (1) whether the proposed activity is a "project" for purposes of CEQA and (2) whether the project is exempt from further analysis under CEQA. (*Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 636; Guidelines, §§ 15060 [preliminary review], 15061 [review for exemption].)

10.

reasons to support the finding of an exemption. The notice of exemption, including a two-page attachment of reasons why the project was exempt, was filed with the court as an exhibit to County's return.

The notice of exemption and the attached statement of reasons both set forth the conclusion that Measure G was exempt from CEQA review under the common sense exemption in Guidelines section 15061, subdivision (b)(3). The opening paragraph of the statement of reasons asserted that Measure G "was exempt from CEQA because it can be seen with a certainty that there is no possibility that [the adoption of Measure G] may have a significant effect on the environment."

Plaintiffs opposed the motion to discharge the writ, arguing the common sense exemption did not apply because County could not be *certain* that there was *no possibility* that Measure G might cause significant environmental effects.

*Order Invalidating Measure G*

In February 2014, the trial court held a hearing on County's motion to discharge the writ. After hearing argument, the court stated its decision was to deny the motion and invalidate Measure G.

On April 28, 2014, the court filed its written order denying the motion to discharge the writ and invalidating Measure G. The court concluded County had failed to identify substantial evidence in the administrative record supporting its determination that the common sense exemption applied. In addition, the court stated County's failure to conduct an adequate preliminary review of the potential environmental impacts of Measure G denied both the board of supervisors and the voters of the opportunity to engage in informed decisionmaking, which is one of the key purposes of CEQA.

*Motion to Vacate Order Invalidating Measure G*

In May 2014, HWY 99, proponents of Measure G, moved to set side and vacate the order invalidating Measure G pursuant to Code of Civil Procedure section 663. HWY 99 alleged it was an aggrieved nonparty whose rights were materially affected by errors

11.

in the order. As operators of a medical marijuana dispensary in an industrially zoned area, HWY 99 supported its motion with a request for judicial notice of (1) Measure G, (2) its application for review of its site development plan, and (3) a report to County's board of supervisors dated February 21, 2012, addressing the board's options for responding to a referendum petition relating to the regulation of medical marijuana dispensaries.

Plaintiffs opposed HWY 99's motion to set aside and vacate the order, asserting (1) the challenged order was correct, (2) the order was not a judgment for purposes of Code of Civil Procedure section 663, (3) HWY 99 was not an aggrieved party, (4) HWY 99's motion was untimely. County did not join in HWY 99's motion to set aside the order invalidating Measure G. Instead, County filed a notice of nonopposition.

In June 2014, the trial court held a hearing on the motion to vacate and directed the parties to submit supplemental briefing. In July 2014, after the supplemental briefs were filed, read and considered, the trial court held another hearing. The court found that HWY 99 was an aggrieved party, its motion was timely, and the invalidation order was an appealable judgment and, thus, subject to a motion under Code of Civil Procedure section 663. As to the merits, the court concluded HWY 99 did not establish that the order was incorrect or erroneous as a matter of law or inconsistent with the facts. Therefore, the court denied HWY 99's motion to vacate.

HWY 99 filed a timely notice of appeal. County did not join in the appeal. Consequently, this appeal involves a dispute between competing medical marijuana dispensaries over the validity of Measure G.

12.

**DISCUSSION**

I.    CEQA'S COMMON SENSE EXEMPTION

A.    <u>Issue Presented</u>

The main issue in this appeal is whether County erred in determining the so-called common sense exemption, set forth in Guidelines section 15061, subdivision (b)(3), exempted Measure G from further CEQA review.

B.    <u>Rules of Law</u>

1.    *Regulatory Text*

The common sense exemption is inherent in CEQA's text and explicitly set forth in Guidelines section 15061 as follows:

> "(b) A project is exempt from CEQA if: [¶] … [¶] (3)  The activity is covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment.  *Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA*."  (Italics added.)

The application of this text to a particular situation requires an understanding of the meaning of (1) the word "certainty"; (2) the related phrases "no possibility" and "may have"; (3) the phrase "the activity in question," which identifies the reach of the exemption; and (4) the phrase "significant effect on the environment."

Of these terms, only the phrase "significant effect on the environment" is defined by the Guidelines.  It refers to "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance."  (Guidelines, § 15382.)

The word "effect" includes both direct (i.e., primary) and indirect (i.e., secondary) effects.  (Guidelines, § 15358; see Pub. Resources Code, § 21065 [definition of "project" refers to "direct physical change" and "reasonably foreseeable indirect physical change"

13.

in the environment].) As is often the case with the adoption of an ordinance, we are concerned with the indirect effects of Measure G. Guidelines section 15358, subdivision (a)(2) addresses indirect effects as follows:

> "Indirect or secondary effects which are caused by the project and are later in time or farther removed in distance, but are still *reasonably foreseeable*. Indirect or secondary effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on air and water and other natural systems, including ecosystems." (Italics added.)

CEQA is concerned with indirect impacts only if they are reasonably foreseeable—an idea reiterated in Guidelines section 15064, subdivision (d)(3):

> "An indirect physical change is to be considered only if that change is a reasonably foreseeable impact which may be caused by the project. A change which is speculative or unlikely to occur is not reasonably foreseeable."

### 2. *Public Agency's Determination*

The common sense exemption and reasonably foreseeable indirect effects were discussed by our Supreme Court in *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372 (*Muzzy Ranch*). The court set forth some of the legal requirements that apply to a public agency's evaluation of whether the common sense exemption applies to a project. Stated in its broadest terms, an agency that relies on the common sense exemption "has the burden of demonstrating it applies." (*Id.* at p. 386.) Based on our reading of *Muzzy Ranch*, we conclude the agency's burden has three distinction aspects.

First, the agency must provide factual support for its determination. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 386.) In the context of a preliminary review, factual support means evidence in the record. (*Id.* at pp. 386-387.) Thus, an agency has a legal obligation to see that the record contains evidence relevant to the application of the commons sense exemption.

14.

Second, the agency must examine the evidence contained in the record. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 387.) In other words, the agency must "consider the record," "consider[] the facts of the matter," or conduct "a factual evaluation of the agency's proposed activity." (*Id*. at pp. 386-387.)

The third and last aspect of an agency's burden of demonstrating the common sense exemption applies involves documenting its evaluation of the evidence. In particular, the record must demonstrate that the agency considered possible environmental impacts in reaching its decision. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 387.) Thus, an agency "has the burden to elucidate [(i.e., explain)] the facts that justified its invocation of CEQA's commonsense exemption." (*Ibid*.) An agency can demonstrate it considered the facts and possible environmental impacts by citing evidence or otherwise referencing the factual record in its notice of exemption. (*Id*. at pp. 386 & 389.)

In this appeal, we are not especially concerned with whether County fulfilled each procedural requirement associated with its burden of demonstrating that the common sense exemption applied. Instead, we are concerned with the ultimate substance of County's decision—that is, whether it correctly determined the common sense exemption applied. (Cf. *Muzzy Ranch*, *supra*, 41 Cal.4th at p. 389 [agency was correct in determining exemption applied despite its procedural errors, such as failing to reference the factual record in its notice of exemption].)

### 3. Judicial Review

Applying the text of Guidelines section 15061, subdivision (b)(3) and determining "whether a particular activity qualifies for the commonsense exemption presents an issue of fact." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 386.) The standard for judicial review of this factual determination is not entirely clear. One CEQA practice guide states: "In *Muzzy Ranch*, the California Supreme Court arguably created some uncertainty regarding

15.

the standard of review that is applied to an agency's use of the common sense exemption." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2015) § 5.129, p. 5-119 (rev. 3/15).)[7]

For purposes of this relatively straightforward case, we need not conduct a detailed analysis of the appropriate standard of review. We can apply the standard most favorable to appellant and the agency—namely, the deferential substantial evidence standard—and easily conclude the common sense exemption does not apply to Measure G.

C.    Analysis of Measure G and Its Indirect Effects

1.    *Identification of Indirect Effects*

Step one of our analysis of the potential indirect effects of Measure G is the identification of physical changes to the environment associated with medical marijuana dispensaries. Completing this step is relatively easy because Measure G contains findings about various types of impacts (including environmental impacts) that dispensaries have. The first provision of Measure G stated:

> "Medical Marijuana Dispensaries have *serious secondary effects* on the community. These secondary effects include, but are not limited to the following: criminal activity, loitering, increased *traffic, noise, litter* and a loss of trade for other businesses located nearby by interference." (Italics added.)

---

**7**    This uncertainty was not decreased by the recent decision in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, where a city relied on two categorical exemptions to end its environmental inquiry and approve a residential building permit. (*Id*. at p. 1092.) The majority referred to Guidelines section 15061, subdivision (b)(3) and stated an agency's inquiry into "unusual circumstances" under Guidelines section 15300.2, subdivision (c)'s exception from categorical exemptions is similar to the inquiry made under the common sense exemption. (*Id*. at p. 1098.) The two concurring justices, Justice Liu and Justice Werdegar, the author of *Muzzy Ranch*, did not agree the inquiry was similar. (*Id*. at p. 1130 (conc. opn. of Liu, J.) ["the term 'similar' is a fudge"—the exacting requirement of the common sense exemption exceeds an agency's obligation under subd. (c) of Guidelines § 15300.2].)

16.

For purposes of this opinion, we will assume that the references to criminal activity, loitering and loss of trade address social and economic impacts, rather than environmental impacts. (See Guidelines, § 15131, subd. (a) [economic and social effects shall not be treated as significant effects on the environment].) The other impacts mentioned—increased traffic, noise and litter—are clearly environmental effects. (See Guidelines, § 15064, subd. (d)(1) [examples of physical changes in the environment include noise and traffic].)

HWY 99 refers to the common sense exemption's use of the word "significant" to modify "effect on the environment" (§ 15061, subd. (b)(3)) and argues that the secondary effects mentioned in Measure G cannot be regarded as significant. We reject this argument because Measure G's finding explicitly identifies the secondary effects as "serious," which we interpret to mean substantial or significant. Another aspect of the strongly worded finding in Measure G is the statement that dispensaries "have" the environmental effect of increased traffic, noise and litter. It does not state that dispensaries "may have" such effects or refer to the effects as possibilities. Therefore, step one of our analysis of Measure G ends with the conclusion that medical marijuana dispensaries have secondary environmental effects in the form of increased traffic, noise and litter and those secondary effects are serious—that is, significant.

### 2. *Reasonably Foreseeable Reactions to Measure G*

Step two of our analysis involves the identification of the reasonably foreseeable reactions to Measure G of the persons who were legally operating medical marijuana dispensaries in County's commercially zoned areas when Measure G was adopted. (See *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1583-1598 (*County Sanitation*) [county's ordinance restricted land application of sewage sludge to farmland; analysis of reasonably foreseeable indirect physical changes to

17.

environment included environmental impacts resulting from reactions to ordinance of both sludge generators and farmer-appliers].)

This step is also simple because County (1) identified two such reactions and (2) explicitly stated its findings. The brief statement of reasons attached to County's notice of exemption states that "[t]here is evidence in the record that Measure G may result in the closure or relocation of existing unregulated medical marijuana dispensaries." This statement is the equivalent of finding that it is reasonably foreseeable for medical marijuana dispensaries operating outside industrial zones to react to Measure G by either closing the dispensary or relocating it.

### 3.  Where Dispensaries Might Relocate

Step three of our analysis is limited to considering the relocation of dispensaries and, more specifically, *where* it is reasonably foreseeable for the dispensaries to relocate.[8] The notice of exemption identifies two reasonably foreseeable possibilities. The first involves the relocation of dispensaries to areas that are within County's jurisdiction (i.e., the unincorporated areas of Kern County) and zoned for industrial use. County's notice of exemption stated that this type of relocation "would not result in a significant impact on the environment because the provisions of Measure G contain specific requirements for the location, establishment and operation of medical marijuana dispensaries which are designed to avoid or substantially reduce the indirect secondary impacts associated with unregulated medical marijuana facilities." Proponents argue that

---

[8]    We can resolve this appeal without analyzing the reasonably foreseeable impacts resulting from dispensary *closures*, which would have included the impacts resulting from the reactions of the dispensary's customers to the closure. Customers might have reacted to closure of a dispensary by (1) stopping their use of medical marijuana, (2) growing medical marijuana for their personal use, (3) obtaining medical marijuana from a dispensary operating legally within an industrial zone, (4) obtaining medical marijuana from a dispensary operating legally outside Kern County, or (5) obtaining marijuana from an illegal source, either inside or outside Kern County.

18.

these restrictions would limit any serious potential environmental impacts from relocating dispensaries.

The second reasonably foreseeable place where dispensaries might relocate are those areas beyond the reach of Measure G—that is, locations outside Kern County. Our inquiry will focus on the environmental impacts of this latter type of relocation. (See *Muzzy Ranch*, *supra*, 41 Cal.4th at p. 388 [agencies are obligated under CEQA to consider geographically distant environmental impacts of their project]; *County Sanitation*, *supra*, 127 Cal.App.4th at p. 1599 [substantial evidence supported argument that County's sewage sludge ordinance would cause adverse changes in physical condition that exist outside Kern County].)

### 4. Impacts Caused by Relocations Outside Kern County

Step four of our analysis seeks to identify the reasonably foreseeable environmental impacts that might occur as a result of dispensaries relocating to areas outside Kern County, where Measure G's restrictions would have no importance. This category of potential impacts was addressed by the notice of exemption's statement that it was premature and too speculative to determine whether relocations might result in reasonably foreseeable significant environmental effects. The notice of exemption also stated that the "new locations to which medical marijuana dispensaries may relocate are unknown at this time so it is not possible to determine the existing physical conditions (baseline) at such locations or whether relocation may result in significant impacts at such unknown locations." In short, County attempted to use this uncertainty about the specific locations where dispensaries would reopen for business and the physical conditions at those locations to support its ultimate finding of fact regarding the common sense exemption—namely, that "it can be seen with a certainty that there is no possibility that [Measure G] may have a significant effect on the environment."

County's ultimate finding of fact regarding the common sense exemption is flawed from a common sense (i.e., logical) perspective of what it means to achieve "certainty that there is no possibility" a project may have a significant environmental effect. (Guidelines, § 15061, subd. (b)(3).) A finding that "it is not possible to determine" if Event X will occur cannot, as a matter of practical common sense, provide the basis for finding that it *is certain* that there is *no possibility* of Event X occurring. To hold otherwise would be to abandon common sense to embrace Orwellian doublethink. (See *Price v. Civil Service Com.* (1980) 26 Cal.3d 257, 286-287 (dis. opn. of Mosk, J.) ["doublethink" means the tortured abuse of words and phrases so that their meaning and effect become inverted].)

More important to our determination of agency error, County's ultimate finding of fact turns a blind eye to the general finding of fact contained in Measure G itself. (See pt. I.C.1, *ante*.) Measure G's first section stated that "Medical Marijuana Dispensaries have serious secondary effects," including "increased traffic, noise, [and] litter." Accepting County's interpretation that this general finding of fact only relates to *unregulated* dispensaries, the finding of fact is relevant to dispensaries that relocate outside Kern County because those dispensaries would not be subject to Measure G's restrictions and performance standards. The general finding recognizes that *any* unregulated dispensary, regardless of location, has serious secondary effects on the environment, which include increased traffic, noise and litter. The strong wording of the finding—dispensaries *have* serious secondary effects—necessarily acknowledges the possibility of significant environmental effects resulting from a dispensary that changes its location to an area not subject to Measure G. Moreover, there is no evidence, substantial or otherwise, to support a determination that the environmental effects identified in the general finding would not occur when dispensaries relocated outside Kern County. Accordingly, the general finding precluded County from subsequently stating with "certainty that there is

20.

no possibility" the dispensaries relocating outside its jurisdiction would have no significant environmental effects. (Guidelines, § 15061, subd. (b)(3).)

In summary, we conclude that the findings made in Measure G prevented County from relying on the common sense exemption.

## II.     CATEGORICAL EXEMPTIONS

HWY 99 also claims the invalidation of Measure G was erroneous because the measure qualified for two categorical exemptions. Although the availability of two categorical exemptions was not addressed in the trial court proceedings, HWY 99 contends this court should address the questions of law involving the categorical exemptions for the first time on appeal because the invalidation of Measure G involves important questions of public interest. We will exercise our discretion and consider whether the categorical exemptions apply to Measure G. (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167; see *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24 [argument raised for first time on appeal may be considered by appellate court where it presents an issue of law involving undisputed facts].) We note that HWY 99, as the appellant, has the burden of establishing error on these grounds. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [appellants must affirmatively demonstrate error].)

### A.     General Principles

Section 21084, subdivision (a) requires the creation of categorical exemptions by stating that the Guidelines "shall include a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from [CEQA]." In response to this legislative directive, Guidelines section 15301 through 15333 set forth the categorical exemptions.

Generally, when the language defining a categorical exemption uses a term that does not have a clearly established meaning (i.e., is ambiguous), the term should not be

broadly interpreted.  (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1193 [term "facilities" used in the Class 1 exemption for the operation or repair of existing facilities was vague and did not include the landfill in question].)  Instead, "we must construe the exemptions narrowly in order to afford the fullest possible environmental protection.  [Citations.]"  (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 697.)  Under this approach, a project will be subject to some level of environmental review "in all but the clearest cases of categorical exemptions."  (*Ibid.*)

B.     Class 8 Exemption

The first categorical exemption cited by HWY 99 relates to ordinances and regulations that are environmentally friendly and is set forth in Guidelines section 15308:

> "Class 8 consists of actions taken by regulatory agencies, as authorized by state or local ordinance, to assure the maintenance, restoration, enhancement, or protection of the environment where the regulatory process involves procedures for protection of the environment. Construction activities and relaxation of standards allowing environmental degradation are not included in this exemption."

We conclude that HWY 99 has not established that the various criteria of the Class 8 exemption were satisfied by Measure G.  First, HWY 99 has not shown that the adoption of Measure G by the voters residing in Kern County was an action "taken by [a] regulatory agenc[y]."  (Guidelines, § 15308.)  HWY 99 has cited no authority for the position that an ordinance adopted by the referendum process is an action taken by a "regulatory agenc[y]" for purposes of Guidelines section 15308.  HWY 99 cited *Save the Plastic Bag Coalition v. County of Marin* (2013) 218 Cal.App.4th 209, a case in which a county's reliance on the Class 8 exemption for an ordinance banning single-use plastic bags was upheld.  In that case, however, the ordinance was adopted by the board of supervisors, not the county's voters.  (*Id.* at p. 213.)

22.

Second, HWY 99's appellate briefing has not addressed whether there was a "regulatory process" that "involve[d] procedures for protection of the environment." (Guidelines, § 15308.)

Third, Measure G does not qualify as an action taken "to assure the maintenance, restoration, enhancement, or protection of the environment." There is no question that part of Measure G was intended to address the environmental impacts of dispensaries. However, Measure G also addressed other concerns related to medical marijuana dispensaries and, overall, would have implemented a rebalancing and reallocation of environmental impacts. The policy choices reflected in the provisions of Measure G would have lessened some environmental impacts, shifted the location of some impacts, and increased or created others. In short, the ordinance did not "assure" protection of "the environment" by encouraging certain dispensaries, along with their adverse environmental impacts, to go elsewhere. (See *County Sanitation*, *supra*, 127 Cal.App.4th at p. 1577 [possibility that an ordinance's net overall impact might be beneficial did not remove obligation to consider the ordinance's negative environmental effects].)

C.      Class 21 Exemption—Enforcement Actions by Regulatory Agency

HWY 99 also contends the adoption of Measure G qualifies for the Class 21 exemption for enforcement actions by a regulatory agency. Pursuant to Guidelines section 15321, the Class 21 exemption covers:

> "(a) Actions by regulatory agencies to enforce or revoke a lease, permit, license, certificate, or other entitlement for use issued, adopted, or prescribed by the regulatory agency or enforcement of a law, general rule, standard, or objective, administered or adopted by the regulatory agency. Such actions include, but are not limited to, the following:

> "(1) The direct referral of a violation of lease, permit, license, certificate, or entitlement for use or of a general rule, standard, or objective to the Attorney General, District Attorney, or City Attorney as appropriate, for judicial enforcement.

"(2) The adoption of an administrative decision or order enforcing or revoking the lease, permit, license, certificate, or entitlement for use or enforcing the general rule, standard, or objective.

"(b) Law enforcement activities by peace officers acting under any law that provides a criminal sanction."

The only published decision mentioning an agency's application of the Class 21 exemption for enforcement actions is *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162. In that case, a city council adopted an ordinance that provided for a systematic code enforcement program that required the inspection of approximately 750,000 residential units at least once every three years and the repair of units found to be in violation of the city's building, safety, fire or health regulations. (*Id*. at p. 1165.) The city council determined the code enforcement program was categorically exempt from CEQA review pursuant to exemptions for (1) the repair and maintenance of existing facilities, (2) inspections to check the performance, quality, health or safety of a project, and (3) regulatory enforcement actions. (*Id*. at pp. 1167-1168; see Guidelines, §§ 15301 [Class 1, repair of existing facilities], 15309 [Class 9, inspections], 15321 [Class 21, regulatory enforcement actions].) The city council's findings stated the program was exempt under Class 21 "'because it is the enforcement of a law administered or adopted by the regulatory agency[.]'" (*Apartment Assn. of Greater Los Angeles, supra,* at p. 1168.) The appellate court concluded substantial evidence supported the city council's finding that the Class 1 exemption applied and, as a result, did not address the meaning of the regulatory text that defines the Class 21 exemption.

HWY 99 contends that "Measure G is the adoption of an order enforcing a law, general rule, standard and objective administered and/or adopted by the COUNTY." This contention tracks language from subdivision (a)(2) of Guidelines section 15321 that refers to "[t]he adoption of an administrative decision or order … enforcing the general rule, standard, or objective" administered or adopted by County.

24.

Under the principle that the categorical exemptions should be narrowly construed, we interpret the phrase "administrative decision or order" such that the term "administrative" modifies both "decision" and "order." (See *Save Our Carmel River v. Monterey Peninsula Water Management Dist.*, *supra*, 141 Cal.App.4th at p. 697 [categorical exemptions are construed narrowly].) Under this interpretation, Measure G must qualify as an "administrative order" to fall within the scope of subdivision (a)(2) of Guidelines section 15321. We conclude that Measure G is a legislative action taken by the voters of Kern County and, as a result, cannot be characterized as an administrative order. In general terms, an administrative order is a command, direction or instruction issued by a government agency after an adjudicatory hearing. (See Black's Law Dict. (9th ed. 2009) p. 1206 [definitions of "order" and "administrative order"].)

As to the language in subdivision (a) of Guidelines section 15321 that refers to "[a]ctions by regulatory agencies to enforce," this language presents nearly the same question raised by HWY 99's assertion of the Class 8 exemption. (See pt. II.B, *ante*.) That exemption addressed certain "[a]ctions taken by regulatory agencies" and we concluded that Measure G was not such an action because it was adopted by the voters of Kern County, who are not a "regulatory agency" within the common meaning of that term. Thus, we also conclude that Measure G was not an action by a regulatory agency for purposes of subdivision (a) of Guidelines section 15321.

Therefore, we conclude that Measure G does not qualify for a Class 21 exemption.

## DISPOSITION

The judgment is affirmed. Organic Health Solutions, Inc., V & G Collective, Inc., and the seven individual respondents shall recover their costs on appeal.

                                                          _____
                                                          FRANSON, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
SMITH, J.